DEVON M. JACOB, ESQUIRE
Pa. Sup. Ct. ID: 89182

JACOB LITIGATION
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com

Counsel for the Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **L. ALICIA RASCON,** *individually,* | : Civil Action No.: CV-14-749-PHX-JJT |
| *and as the Personal Representative of the* | : (Filed: April 10, 2014) |
| **ESTATE OF JORGE E. SANCHEZ;** | : District Judge: John J. Tuchi |
| **JUAN A. SANCHEZ;** *and* | : |
| **TONI MARQUIS,** *as the Parent and* | : |
| *Next Friend of* **A.M.,** *a minor;* | : |
| | : CIVIL ACTION – LAW |
| **v.** | : JURY TRIAL DEMANDED |
| | : |
| **CLINTON H. BROOKINS (#9452);** | : |
| **JEREMY KING (#9144);** | : |
| **NICHOLAS R. WELCH (#9374);** | : |
| **STEVEN SQUIER (#9147);** | : |
| **CITY OF PHOENIX, ARIZONA;** *and* | : |
| **TASER® INTERNATIONAL, INC.;** | : |
| **Defendants.** | : |

## FIRST AMENDED COMPLAINT

**AND NOW** come the Plaintiffs; L. Alicia Rascon, individually, and as the

Personal Representative of the Estate of Jorge E. Sanchez; Juan A. Sanchez; and

1

Toni Marquis, as the Parent and Next Friend of A.M., a minor; by and through their undersigned counsel, and the law firm of Jacob Litigation, and aver as follows:

## Introduction

This case involves Jorge E. Sanchez, who died at the hands of Clinton H. Brookins (#9452), Jeremy King (#9144), Nicholas R. Welch (#9374), and Steven Squier (#9147), police officers employed by the City of Phoenix, Arizona. When the Defendant police officers killed Mr. Sanchez, he had not committed any serious or violent crimes, had not hurt anyone, and did not present as a threat to anyone. The Defendant police officers unlawfully killed Mr. Sanchez by TASERing him in the left chest for 53 of 59 seconds, while carotid choking him, and while handcuffing and hogtying him. The policies, practices, and customs of the City of Phoenix, Arizona, and the defective and dangerous products of TASER® International, Inc., also caused Mr. Sanchez's death.

## Jurisdiction and Venue

1.      This action is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343 & 1367.

3.      Venue is proper in this Court, as all Defendants are located within the District of Arizona, and the cause of action arose in the District of Arizona.

4.      On or about October 4, 2012, the Defendant, City of Phoenix, Arizona,

and the Individual Defendants, were served with a detailed written notice of the Plaintiffs' complaints as stated herein.

## Parties

5.    Plaintiff, L. Alicia Rascon, is the biological mother of the decedent, Jorge E. Sanchez, and is the Personal Representative of the Estate of Jorge E. Sanchez ("Estate").   Ms. Rascon is an adult who currently resides in Gardena, California.

6.    Plaintiff, Toni Marquis, is the biological mother of A.M., a minor, who is the biological daughter of the decedent, Jorge E. Sanchez.   Ms. Marquis is an adult who currently resides in Phoenix, Arizona.

7.    Plaintiff, Juan A. Sanchez, is the biological father of the decedent, Jorge E. Sanchez.   Mr. Sanchez is an adult who currently resides in Tucson, Arizona.

8.    Defendant, Clinton Brookins, is an adult individual, who, during all relevant times, was employed by the City of Phoenix, Arizona, as a police officer. All of Defendant Brookins' actions or inactions were taken under color of state law. He is sued in his individual capacity.

9.    Defendant, Jeremy King, is an adult individual, who, during all relevant times, was employed by the City of Phoenix, Arizona, as a police officer.   All of

Defendant King's actions or inactions were taken under color of state law. He is sued in his individual capacity.

10. Defendant, Nicholas Welch, is an adult individual, who, during all relevant times, was employed by the City of Phoenix, Arizona, as a police officer. All of Defendant Welch's actions or inactions were taken under color of state law. He is sued in his individual capacity.

11. Defendant, Steven Squier, is an adult individual, who, during all relevant times, was employed by the City of Phoenix, Arizona, as a police officer. All of Defendant Squier's actions or inactions were taken under color of state law. He is sued in his individual capacity.

12. Defendant, City of Phoenix, Arizona (hereinafter "City" or "City of Phoenix") was incorporated as a City in 1881. The City owns and operates the Phoenix Police Department, which during all relevant times, employed the Individual Defendants.

13. Defendant, TASER® International, Inc. ("TASER®"), is a Delaware Corporation that is licensed to do business in the State of Arizona. TASER®'s corporate office is located at 17800 North 85th Street, Scottsdale, Arizona 85255. TASER® is the manufacturer of an electrical control device ("ECD") commonly

referred to as a TASER, which is used for the neuromuscular incapacitation of individuals.

## **Factual Background**

14.     The Decedent is Jorge Esteban Sanchez, age 31, who, is known to his family as "Bebo," which, in Spanish, means "little boy."

15.     In life, Mr. Sanchez was fun-loving, comedic, and high-spirited, but battled a drug addiction.

16.     Mr. Sanchez is survived by A.M., a minor, his biological daughter; L. Alicia Rascon, his biological mother; Juan A. Sanchez, his biological father; Juan M. Sanchez, his biological brother; Gilda M. Sanchez, his biological sister; and Adrian A. Sanchez, his biological brother.

17.     On April 10, 2012, at approximately 10:20 PM, police officers from the Phoenix Police Department were dispatched to the CVS located at 1855 West Thunderbird Road, in the City of Phoenix, Arizona, to investigate a report of a male who was pacing in the parking lot.

18.     On the same date and approximate time, officers from the Phoenix Police Department were dispatched to the area of 20th Lane and Thunderbird Road, in the City of Phoenix, Arizona, to investigate a report of a male walking eastbound, who had blood on his abdomen and who claimed to have been hit by a car or shot.

19.     As officers responded to the second dispatch, they encountered the decedent, Jorge E. Sanchez, who matched the description of the male in both dispatches, walking eastbound, in the area of Macayo's Mexican Restaurant, 1909 W. Thunderbird Road, in the City of Phoenix, Arizona.

20.     Defendants, Welch and King, admit that Mr. Sanchez advised them that he had been hit by a car, and then watched as he walked out into the roadway and laid down.

21.     Instead of blocking the roadway and assessing Mr. Sanchez's medical condition and needs, Defendants, Welch and King, admit that they dragged Mr. Sanchez by his arms out of the roadway and onto the sidewalk, which apparently aggravated Mr. Sanchez, who was already confused and injured.

22.     Around this time, Defendants, Brookins and Squier, arrived.

23.     The Individual Defendants admit that upon encountering Mr. Sanchez, they observed blood on his arms and heard him moaning.

24.     Moreover, the Individual Defendants admit that when Mr. Sanchez spoke, his statements were not coherent.

25.     The Individual Defendants knew or should have known that Mr. Sanchez was under the influence of drugs and/or alcohol, and was physically injured.

26.     The Individual Defendants recognized that Mr. Sanchez's conduct was a symptom of a deteriorating medical condition, and not criminal in nature, yet they delayed attempting to provide him with necessary emergency medical care.

27.     The Individual Defendants claim that Mr. Sanchez "stood up and began to swing at Officers."

28.     Mr. Sanchez, however, did not hit any of the Individual Defendants.

29.     Mr. Sanchez did not pose a threat to any of the Individual Defendants or to any third parties.

30.     Mr. Sanchez had not committed any serious and/or violent crimes.

31.     Regardless, the Individual Defendants physically forced Mr. Sanchez to the ground "because he was not complying and continuing to swing his arms."

32.     Defendant Welch then struck Mr. Sanchez in his ribs breaking several of his ribs.

33.     Mr. Sanchez stood up, at which time Defendant King deployed a TASER into Mr. Sanchez's left chest.

34.     Mr. Sanchez began to walk away, which posed no threat to himself or others.

35.     Defendant King followed alongside of Mr. Sanchez, so that the TASER prongs would remain lodged in Mr. Sanchez's left chest.

36.   Defendant King repeatedly cycled the TASER; thereby continuing to deliver an electrical charge into Mr. Sanchez's heart.

37.   While Defendant King continued to cycle the TASER, Defendant "Brookins ran into the back of the subject and knocked him down."

38.   Defendant "Brookins placed his left forearm across the subjects neck and placed another hand above his ear, pinning his head downward."

39.   Defendant Squier admits that he held Mr. Sanchez's legs.

40.   Defendant Welch either alone or with the assistance of the other Individual Defendants, applied handcuffs to Mr. Sanchez's wrists (that had been pulled behind his back).

41.   After Mr. Sanchez was handcuffed, Mr. Sanchez's "Legs were ultimately folded upward towards his buttocks" by one or more of the Individual Defendants, while he was handcuffed and face-down on the pavement.

42.   When Mr. Sanchez went limp, Defendant King stopped cycling the TASER and Defendant Brookins released pressure from Mr. Sanchez's neck.

43.   Defendant Brookins was the last of the Individual Defendants to get up off of Mr. Sanchez.

44.   It was discovered that Mr. Sanchez was no longer breathing.

45.   The restraints were removed from Mr. Sanchez and CPR was initiated.

46. Mr. Sanchez was transported by ambulance to the John C. Lincoln-North Mountain Medical Center, 250 E. Dunlap Avenue, in the City of Phoenix, Arizona.

47. On April 10, 2012, at 10:55 PM, Mr. Sanchez was pronounced dead.

48. Each of the Individual Defendants had an appreciable opportunity to intervene to stop each of the other Individual Defendants from engaging in the use of force discussed herein but failed to do so.

49. Instead, each of the Individual Defendants participated in the use of force engaged in by each of the other Individual Defendants.

50. A short time after the incident, Defendant Brookins was observed with abrasions on the knuckles of his right hand and his right wrist, Defendant Squier was observed with what appeared to be blood transfer on the left side of his neck, and Defendant Welch was observed with what appeared to be blood transfer on his forearms.

51. The Phoenix Fire Department EMS Incident Report indicates that officers reported to EMS personnel that they had "'tased him twice' & 'carotid choked him twice.'"

52. Police officers, who notified Ms. Rascon of the death of her son, confirmed that Mr. Sanchez had not injured anyone.

53.    At the time of his death, Mr. Sanchez possessed a cellphone and other personal property, which the Defendant City seized and has not returned to the family.

54.    The TASER used on Mr. Sanchez is a model X26 TASER, serial number X00-561139, manufactured by Defendant TASER® International, purchased by the Defendant City, and issued by the Defendant City to Defendant King.

55.    The records of the Defendant City indicate that Defendant King activated the X26 TASER as follows:

| START | END | DURATION |
|-------|-----|----------|
| 22:27:16 | 22:27:35 | 19 Seconds |
| 22:27:39 | 22:28:08 | 29 Seconds |
| 22:28:10 | 22:28:15 | 5 Seconds |

**TOTAL DURATION:  53 Seconds**

56.    Specifically, during a 59 second period of time, Defendant King activated his TASER for 53 seconds.

57.    The X26 TASER is designed to affect the sensory and motor nervous systems, overriding the central nervous system, and causing uncontrollable muscle contractions that make it physically impossible for a person exposed to the X26 TASER to not respond to its effects.

58.     Defendant TASER® failed to warn Defendant City that the TASER in question is a deadly weapon.

59.     In the alternative, Defendant City ignored Defendant TASER®'s warning that the TASER in question is a deadly weapon, and failed to adopt a proper policy and provide proper training to the Individual Defendants governing its use.

60.     In the further alternative, the Individual Defendants ignored the Defendant City's TASER policy and related training.

61.     Defendant TASER® failed to sufficiently warn Defendant City that Defendant TASER® had knowledge that deploying the TASER into the left chest increases the risk of death.

62.     In the alternative, Defendant City ignored Defendant TASER®'s warning that deploying the TASER into the left chest increases the risk of death, and failed to adopt a policy prohibiting the deployment of the TASER into the left chest when the use of deadly force is not lawful and justified, and failed to train the Individual Defendants accordingly.

63.     In the further alternative, the Individual Defendants ignored Defendant City's TASER policy and related training.

64.     Defendant TASER® failed to sufficiently warn Defendant City that the repeat cycling of the TASER and/or prolonged exposure to the TASER increases the

risk of death.

65. In the alternative, Defendant City ignored Defendant TASER®'s warning that the repeat cycling of the TASER and/or prolonged exposure to the TASER increases the risk of death, and failed to adopt a proper policy and provide proper training to the Individual Defendants governing its use.

66. In the further alternative, the Individual Defendants ignored the Defendant City's TASER policy and related training.

67. Defendant TASER® International failed to sufficiently warn Defendant City that there is an increased risk of death when using a TASER on persons suffering from certain types of drug intoxication.

68. In the alternative, Defendant City ignored Defendant TASER®'s warning that there is an increased risk of death when using a TASER on persons suffering from certain types of drug intoxication, and failed to adopt a proper policy and provide proper training to the Individual Defendants governing its use.

69. In the further alternative, the Individual Defendants ignored the Defendant City's TASER policy and related training.

70. Defendant TASER® failed to sufficiently warn Defendant City that there is an increased risk of death when using a TASER on persons who are being choked.

71.     In the alternative, Defendant City ignored Defendant TASER®'s warning that there is an increased risk of death when using a TASER on persons who are being choked, and failed to adopt a proper policy and provide proper training to the Individual Defendants governing its use.

72.     In the further alternative, the Individual Defendants ignored the Defendant City's TASER policy and related training.

73.     Defendant TASER® failed to sufficiently warn Defendant City that there is an increased risk of death when using a TASER on persons who are being physically restrained on their stomachs, on a hard surface, while being handcuffed behind their back and/or hogtied.

74.     In the alternative, Defendant City ignored Defendant TASER®'s warning that there is an increased risk of death when using a TASER on persons who are being physically restrained on their stomachs, on a hard surface, while being handcuffed behind their back and/or hogtied, and failed to adopt a proper policy and related training to the Individual Defendants governing its use.

75.     In the further alternative, the Individual Defendants ignored the Defendant City's TASER policy and related training.

76.     Defendant City failed to adopt a proper policy and provide proper training governing the use of carotid or other choke holds.

77. In the alternative, the Individual Defendants ignored the Defendant City's policy and training related to the use of carotid or other choke holds.

78. Defendant City failed to adopt a proper policy and provide proper training governing the use of knee strikes to the ribs or other body parts.

79. In the alternative, the Individual Defendants ignored the Defendant City's policy and training related to the use of knee strikes.

80. Defendant City failed to adopt a proper policy and provide proper training governing the use of hogties or similar restraint devices.

81. In the alternative, the Individual Defendants ignored the Defendant City's policy and training related to the use of hogties or similar restraint devices.

82. The TASER's electrical current causes severe muscle contractions, which in turn, cause the muscles to secrete lactic acid into the blood.

83. If the body cannot compensate for the increasing metabolic acidosis, cardiac arrest will occur.

84. Medical records indicate that at the time of death, Mr. Sanchez's lactic acid level was elevated to 39.9, which is not consistent with life.

85. The treating physician at the John C. Lincoln Hospital stated in the Medical records that "Cause of death could possibly be from the taser incident and/or the chokehold or some unbeknownst trauma that is not apparent to me at this time."

86.     On the left chest, the Medical Examiner located "two pinpoint black defects that measures 1/16 inch in diameter each (and one of them possibly has a very small faint gray metallic barb within its depth)."

87.     Internal examination during an autopsy did not reveal significant evidence of gross lethal natural disease processes.

88.     Moreover, Mr. Sanchez's heart appeared to be healthy.

89.     The Medical Examiner issued the following diagnoses:

I.     Sudden adult death associated with being subdued while acutely intoxicated with methamphetamine and ethanol.
    A. Became unresponsive while being subdued by law enforcement.
        1. Electrical discharge device used.
        2. Carotid choke hold used, reportedly.
            a. Bilateral neck hemorrhages, mild.
            b. Bony structures of the neck are without fracture.
    B. Toxicology testing detected methamphetamine and ethanol.

II.     Other blunt force injuries.
    A. Abrasions, contusions, and a few lacerations over the skin surfaces.
    B. Subgaleal hemorrhage.
    C. Subdural hemorrhage, mild (less than 10 mL in aggregate).
    D. Right-sided rib fractures, three.

90.     The Medical Examiner issued the following cause of death: "Sudden adult death associated with being subdued while acutely intoxicated with methamphetamine and ethanol."

91.     The Defendant City has an established policy, practice, or custom of permitting police officers to use TASERs on subjects who do not present any threat to anyone.

92.     In this regard, prior to the incident in question, after completing an analysis of the Phoenix Police Department use-of-force reports, *The Arizona Republic* found 377 incidents involving the use of a TASER.

93.     It was reported that in nearly nine out of ten of the incidents, the subjects had posed no imminent threat with any weapons to police officers.

94.     By way of example only: A shoplifter who stole four cans of soup from a Food City and then fled on a bike was TASERed as officers dragged him to the ground; a 15-year-old boy at Alhambra High School was TASERed in the back as officers attempted to arrest him on a marijuana charge; and an intoxicated man who ignored commands to leave a bar was TASERed in the back as he walked away.

95.     Similarly, Mr. Sanchez did not pose a threat to anyone when he was TASERed.

96.     It is believed and therefore averred that prior to the incident in question, other persons who did not present a threat to police officers or others had been subjected to excessive force and/or choked to death by police officers of the Defendant City.

97.   In 2008, Defendant Brookins applied to the Phoenix Police Department.

98.   Upon information and belief, the Defendant City knew that Defendant Brookins had previously and recently failed a psychological exam in connection with an application to become a police officer at another Police Department in Arizona.

99.   Despite knowledge of the failed psychological exam, the Defendant City hired Defendant Brookins, armed him, provided him with police authority, and permitted him to respond to citizens' requests for police services.

100.   During the Defendant City's interview and employment process, the Defendant City received notice of issues calling Defendant Brookins' fitness and ability to serve as a police officer into question.

101.   After the Defendant City hired Defendant Brookins, the Defendant City received notice that Brookins had posted multiple disturbing comments on a Facebook page, which in light of his job responsibilities, called Defendant Brookins' judgment, mental health, and emotional stability, into question.

102.   These red flag comments, which the Defendant City essentially ignored, foreshadowed the unlawful violence that would occur.

103. Upon information and belief, Defendant Brookins' Facebook comments included:

> • God grant me the serenity to accept the things I cannot shoot,
>   The courage to shoot the things I can,
>   And the wisdom to hide the rest.
>
> • What a nice day…..I should kill something.
>
> • Tired… Hope no one pushes my buttons. LMAO.
>
> • How many cops does it take to get a suspect downstairs? None, he Fell.

104. To date, the Defendant City has been placed on notice of numerous instances involving Defendant Brookins' use of unlawful force while performing as a police officer for the Defendant City.

105. Such instances have included but are not limited to a 2012 incident wherein Brookins grabbed a female detainee causing physical injury, and dragged her through a puddle of urine; a 2013 fatal shooting of an unarmed mentally ill man who was being restrained by four other police officers; and the instant matter.

106. Despite knowing of such incidents, the Defendant City failed to properly investigate the incidents, and failed to take any action to ensure that Defendant Brookins would be criminally prosecuted.

107. The Defendant City failed to issue Defendant Brookins appropriate discipline and/or corrective training.

108. The Defendant City failed to provide Defendant Brookins with proper oversight and supervision.

109. The Defendant City failed to send Defendant Brookins for further psychological evaluation and/or provide him with necessary psychological or psychiatric treatment.

110. Instead, the Defendant City internally and publicly commended Defendant Brookins for his conduct.

111. Moreover, when sued for his conduct, despite not being required to do so, the Defendant City has agreed to defend Defendant Brookins, and to provide Defendant Brookins with his own private civil attorney paid for by the Defendant City and/or its insurer.

112. The Defendant City's aforementioned failures created, encouraged, enforced, and maintained a culture where excessive force was permitted and expected.

113. Despite the fact that disease and/or other medical conditions did not cause Mr. Sanchez's death, but rather a combination of TASERing, choking, and other trauma inflicted by the Individual Defendants caused Mr. Sanchez's death, the

Defendant City did not properly report Mr. Sanchez's death as a homicide to the Federal Bureau of Investigation ("FBI") as required, so that the death would be properly recorded in the Uniform Crime Reports.

114. The Defendant City's failure to properly report Mr. Sanchez's death to the FBI was likely an attempt to shield the incident and resulting death from the scrutiny of the United States Department of Justice ("DOJ").

115. Defendant TASER® is engaged in the business of manufacturing, distributing and selling electrical control devices ("ECDs") to law enforcement agencies throughout the United States, as well as replacement cartridges for the continuing use of said products.

116. In connection with the original sale, and to promote and encourage ongoing sales, Defendant TASER® makes representations regarding the potential risks and medical safety of its ECDs, including the model X26 TASER, and provides training and training materials for law enforcement agencies to use in instructing their officers in the purported safe use of its products.

117. Defendant TASER®'s marketing campaign has always been that TASERs are a safe alternative to the use of lethal force.

118. In this regard, the company's slogan, 'Saving Lives Every Day,' is displayed on Defendant TASER®'s corporate headquarters in Scottsdale, Arizona.

119.   Defendant TASER® changed its weapon's propellant from gunpowder to nitrogen, which permitted the company to escape regulation from the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and to avoid testing by the Consumer Products Safety Commission.

120.   Defendant TASER® sold ECDs, including the model X26 TASER in question, to Defendant City and has provided training materials to Defendant City from the date of the original sale until the present day, in connection with those sales.

121.   Defendant TASER® knows that law enforcement agencies such as the Phoenix Police Department do not independently research medical risks posed by ECDs like the model X26 TASER but instead rely on medical, training, and safety information provided by Defendant TASER®.

122.   When Defendant TASER® International introduced its products like the model X26 TASER into the market in 1999, Defendant TASER® represented that its products did not affect heart rhythms in humans.

123.   However, in or around 2007, Defendant TASER® became aware that its products like the model X26 TASER could cause a negative effect on a person's heart, i.e., capture, pacing, rate, and/or rhythm.

124.   Defendant TASER® knew that its products, like the model X26 TASER, could cause fibrillation, tachycardia, and/or cardiac arrest.

125.   Defendant TASER®, however, waited until October 12, 2009, to issue

a statement, which provided in relevant part, the following:

> Should Sudden Cardiac Arrest occur in a scenario involving a TASER® discharge to the chest area – it would place the law enforcement agency, the officer, and TASER® International in the difficult situation of trying to ascertain what role, if any, the TASER® ECD could have played in a unique situation that cannot be replicated in human clinical safety evaluations. In order to reduce the risk of such an event, and in light of the fact that frontal applications of TASER® ECD's have been found to be more effective when the probes are targeted at the lower torso (engaging the balancing muscles of the pelvic triangle) we have lowered the recommended point of aim from the center of mass to the lower center of mass for frontal discharges. We believe this recommendation will improve the effective use of TASER® ECDs while also further increasing safety margins and enhancing the ability to defend such cases in post event legal proceedings[.]

126.   TASER then lowered the preferred target area for frontal shots from

center of mass to lower-center of mass, providing three reasons for the change:

> A. Simplify targeting for all TASER® systems to one easy to remember map, avoiding chest shots when possible and the risk of a head/eye shot in a dynamic situation, as is standard for impact munitions.

> B. When possible, avoiding chest shots with ECDs avoids the controversy about whether ECDs do or do not affect the human heart.

> C. Close-spread ECD discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region.

127. In a follow up release to customers, TASER® clarified that it is trying to minimize the risk of defending death cases involving the device where the probes are in close proximity to the heart.

128. Moreover, it is believed and therefore averred that Defendant TASER® became aware that its products, like the model X26 TASER, could have a negative effect on neuropathological mechanisms.

129. Specifically, it is believed and therefore averred that the electrical current from a TASER can overload the brain electrically to the point that it cannot compensate adequately for the sudden surge in energy.

130. As a result, the neurons of the brain begin to misfire, creating mechanoporation, which is the brain's equivalent of ventricular fibrillation.

131. Essentially, the brain shuts off, and in doing so, shuts off all other systems of the body, including the heart and lungs.

132. Up and until the date of the incident in question, Defendant TASER®'s training programs and literature failed to fully and properly incorporate or communicate the available medical studies regarding the dangers of their products.

133. To the contrary, Defendant TASER® continued to represent to law enforcement and the public that its products are a less than lethal weapon.

134.   Defendant TASER® knows that the model X26 TASER causes stress on the body, which can result in physical injury or death.

135.   The model X26 TASER is designed to shut off after a preprogrammed amount of time (5 second cycle).

136.   Despite knowing the substantial medical risks associated with continued exposure, Defendant TASER® designed the model X26 TASER so that the preprogrammed amount of cycle time can easily be overridden by the user, and unlimited additional 5 second bursts administered to the target (which occurred in this incident).

137.   Defendant TASER® continues to ignore the related dangers of designing its products like the model X26 TASER to permit the user to override the preset cycle time, while knowing that its products are being regularly misused in the field by law enforcement personnel.

138.   Defendant TASER®'s model X26 TASER is no less lethal than a gun – if it is fired into the left chest it will likely kill – if it is fired into the foot it will not kill.

# COUNT I

## Plaintiff Estate v. Individual Defendants
## Fourth Amendment – Excessive Force
### (pursuant to 42 U.S.C. § 1983)

139. Paragraphs 1-138 are stated herein by reference.

140. Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

141. Despite the fact that the Individual Defendants were not presented with the threat of serious injury or death, they provoked the need to use force, and in fact used deadly force, against Mr. Sanchez in the form of 53 seconds of TASER strikes to the left chest in a 59 second period of time; knee strikes to the ribs that broke and bruised ribs; pressure to the neck, airway, and carotid artery that limited or cut off air and blood flow; and hogtying and handcuffing Mr. Sanchez while he was lying face-down on a hard surface.

142. The forced used by the Individual Defendants to effect the arrest Mr. Sanchez was excessive, and therefore, unlawful.

143. The unlawful force used against Mr. Sanchez was for the purpose of inflicting pain, physical injury, torture, and punishment.

144. The use of a TASER merely to obtain behavior compliance, when there is no associated threat to anyone, is not lawful and not in accordance with accepted

police practices.

145. Each ECD cycle, or five (5) seconds of discharge, must be objectively reasonable, which in this case, they were not.

146. At the time when the force was used, all four Individual Defendants were present, Mr. Sanchez did not pose an immediate threat to anyone, and Mr. Sanchez had not committed any serious and/or violent crimes.

147. Moreover, the Individual Defendants knew or should have known that as a result of Mr. Sanchez's medical condition and state of mind, he could not comprehend or comply with the Individual Defendants' commands.

148. The Individual Defendants were required to move in quickly to handcuff and otherwise restrain Mr. Sanchez, so as to avoid the need for excessive cycling of the TASER, but failed to do so.

149. Therefore, multiple ECD cycles or five (5) seconds of discharge cannot be legally justified solely on the basis that Mr. Sanchez allegedly failed to comply with the Individual Defendants' commands.

150. The Individual Defendants were not trained to use knee strikes to the ribs but were permitted by the Defendant City to do so.

151. The Individual Defendants were not trained to use carotid artery and/or neck choking but were permitted by the Defendant City to do so.

152. Despite the medical dangers associated with same and the fact that hogtying a person is not an acceptable or safe means of restraint (especially while the person is face-down on a hard surface, intoxicated, and/or excited), it is believed and therefore averred that the Individual Defendants hogtied Mr. Sanchez.

153. The force used by the Individual Defendants against Mr. Sanchez violated the Fourth Amendment to the U.S. Constitution.

154. The Individual Defendants engaged in their conduct with a complete disregard for the value of Mr. Sanchez's human life.

155. As a direct and proximate cause of the Individual Defendants' actions, Mr. Sanchez suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT II

**Plaintiff Estate v. Individual Defendants**
**Fourteenth Amendment – Denial of Medical Care**
**(pursuant to 42 U.S.C. § 1983)**

156. Paragraphs 1-155 are stated herein by reference.

157. Mr. Sanchez was a pretrial detainee in the custody of the Individual Defendants.

158. While a pretrial detainee, the Individual Defendants had a duty to protect Mr. Sanchez and to attend to his medical needs.

159.  The Individual Defendants, however, knew of but ignored Mr. Sanchez's serious medical needs associated with drug intoxication, being hit by a car, a decreased level of consciousness, and being TASERed and choked.

160.  As a direct and proximate cause of the Individual Defendants' actions, Mr. Sanchez suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT III

### Plaintiff Estate v. Defendant City of Phoenix, Arizona
### Fourth/Fourteenth Amendments – Municipal Liability
#### (pursuant to 42 U.S.C. § 1983)

161.  Paragraphs 1-160 are incorporated herein by reference.

162.  "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

163.  Policymakers of the Defendant City participated in, authorized, and/or acquiesced in, the unlawful conduct discussed herein; adopted, implemented, and/or enforced, policies and practices that did not comport with state and federal law;

and/or failed to adopt, implement, and/or enforce, policies and practices that comport with state and federal law.

164. The Defendant City maintained policies, practices, and customs, which were the moving force that resulted in Mr. Sanchez's constitutional rights being violated.

165. The Defendant City knew that Defendant Brookins was mentally ill and/or unstable and prone to the use of unlawful force and violence before the City hired him but the City hired him anyway.

166. During his employment, the Defendant City discovered further credible evidence that Defendant Brookins was mentally ill and/or unstable, and that his mental health was deteriorating, but the Defendant City took no action to protect its citizens from Defendant Brookins.

167. The existence of the Defendant City's unlawful policies, practices, and customs, are proven, in part, by post-event evidence, including but not limited to, the City's actions and/or inactions in response to (a) the 2012 incident wherein Brookins grabbed a female detainee causing physical injury, and dragged her through a puddle of urine; (b) the 2013 fatal shooting of an unarmed mentally ill man who was being restrained by four other police officers; and (c) the instant matter.

168.   In addition, before the incident in question, the Defendant City knew that its officers were using unlawful force on citizens but failed to take any action to correct the issue until it faced a threat in or around 2013 of intervention by the U.S. Department of Justice.

169.   The Defendant City knew that its police officers would regularly be in contact with persons who suffered from disabilities, including but not limited to drug addiction and mental illness, but failed to adopt proper policies and/or provide its officers with appropriate training, including but not limited to, training on the Americans with Disabilities Act.

170.   The Defendant City knew that its police officers would regularly be in contact with persons wherein they may use force, including but not limited to knee strikes, choke holds, and ECDs, including TASERs, but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's constitutional and statutory rights being violated.

171.   The Defendant City was on notice of physiological changes that occur in the human body as a result of being subjected to the use of an ECD, such as a TASER, but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's constitutional and statutory rights being violated.

172.    The Defendant City was on notice of tactical adjustments and considerations required to accommodate life-threatening physiological changes that occur in the human body as a result of being subjected to the use of an ECD, such as a TASER, but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's constitutional and statutory rights being violated.

173.    The Defendant City was on notice of medical treatment required to address life-threatening physiological changes that occur in the human body as a result of being subjected to the use of an ECD, such as a TASER, but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's constitutional and statutory rights being violated.

174.    The Defendant City knew that its police officers would regularly be involved in situations implicating the Fourth and Fourth Amendment but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's constitutional and statutory rights being violated.

175.    The Defendant City knew that its police officers would regularly be in contact with persons exhibiting aggressive behaviors and/or non-compliant behaviors, as the result of a medical condition, but failed to adopt proper policies or provide its officers with appropriate training, which resulted in Mr. Sanchez's

constitutional and statutory rights being violated.

176.  The Defendant City failed to implement an effective process to ensure that policies and training of the Defendant City are followed by its police officers.

177.  It is believed that discovery will reveal, and therefore averred, that when it has been determined that officers have violated the constitutional or statutory rights of persons, or used unlawful force against persons, or when police officers have been named in citizen complaints, or when the Defendant City has settled civil lawsuits, the Defendant City has not required police officers to receive corrective or additional training.

178.  It is believed that discovery will reveal, and therefore averred, that the Defendant City did not follow its internal affairs policy and properly investigate, discipline, or retrain the Individual Defendants for the conduct discussed in this Complaint.

179.  If it is ultimately determined that an internal affairs investigation occurred, it is believed that discovery will reveal, and therefore averred, that the investigation was triggered as a result of a threat of civil litigation (so as to be a defense to the litigation), as opposed to when the Defendant City first learned of the incident discussed herein.

180.  The Defendant City's policies and practices caused the Plaintiff to

suffer the constitutional and statutory injuries described herein.

181.  Moreover, it is believed that discovery will reveal, and therefore it is averred, that the Defendant City's policies and practices caused other persons to suffer similar constitutional and statutory injuries.

182.  Finally, it is believed that despite the fact that the statute of limitations for a § 1983 claim is two years, in an effort to avoid liability for wrongdoing, the Defendant City failed to implement an electronic document retention policy that ensures that all relevant and material documents are retained after 180 days.

183.  As a direct and proximate cause of the Defendant City's actions, Mr. Sanchez suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT IV

### Plaintiff Estate v. Defendant TASER®
### Strict Products Liability
#### (pursuant to Arizona State Law)

184.  Paragraphs 1-183 are stated herein by reference.

185.  Arizona recognizes the strict liability of manufacturers and sellers of defective products that are unreasonably dangerous and cause physical harm to the consumer or his/her property.

186.  Defendant TASER® has an ongoing duty to use reasonable and

ordinary care in providing truthful and up-to-date medical, training, and safety information in connection with the ongoing use of its products by various law enforcement agencies.

187.   Defendant TASER® has a duty to manufacture safe products, which includes the duty to design its products, like the model X26 TASER, so that the cycle settings cannot be overridden by the user.

188.   Defendant TASER® has a duty to stop selling its products or to manufacture safer products after it is discovered that its products are being used improperly by law enforcement personnel.

189.   Defendant TASER® has a further duty to provide sufficient warnings to inform its users and consumers of the medical risks associated with its product and how to avoid or minimize said risks, but has no duty to warn its users and customers about potential civil liability and how to avoid same.

190.   Defendant TASER®'s failure to provide sufficient warnings and instructions, resulted in its products being defective.

191.   Defendant TASER® knowingly misrepresented that its products are "less-lethal" despite knowing that its products are lethal.

192. As a direct and proximate result of the foregoing malicious, wanton, reckless, and negligent conduct, the Individual Defendants were not sufficiently warned or trained:

    a. That the ECD in question is a *deadly* weapon;

    b. That the ECD in question should only be used when the use of *deadly* force would be lawful and justified;

    c. That the ECD in question should only be deployed into the chest when the use of *deadly* force would be lawful and justified;

    d. On the medical dangers associated with extending the duration of the pulsing electrical current of the ECD in question beyond the pre-programmed setting.

    e. To recognize symptoms associated with the buildup of lactic acid in the body during the use of the ECD in question, and how to respond medically to same.

193. Defendant TASER®'s conduct was motivated by a desire to increase its profits with a complete disregard for the value of human life.

194. Defendant TASER® consciously pursued a course of conduct for many years while knowing that it created a substantial risk of significant harm to others.

195.   Accordingly, Plaintiff seeks punitive damages in the maximum amount permitted by law.

196.   As a direct and proximate cause of the Defendant's actions, Mr. Sanchez suffered immense physical pain, humiliation, fear, physical injuries, and death.

## COUNT V

**Plaintiff Estate v. Defendants** (except Defendant TASER®) (pursuant to 42 U.S.C. § 1983)
**Plaintiff Estate v. Defendant TASER®** (pursuant to Arizona State Law)
**Survival Action**

197.   Paragraphs 1- 196 are stated herein by reference.

198.   Arizona's survival statute provides: "Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed." A.R.S. § 14-3110.

199.   Under Arizona's survival statute, "[t]he claim passes from the decedent to the personal representatives, and becomes an asset of the estate." Gandy v. United States, 437 F.Supp.2d 1085, 1086 (D. Ariz. 2006) (citing Barragan v. Superior Court

of Pima County, 12 Ariz. App. 402, 470 P.2d 722, 724 (Ariz. Ct. App. 1970)).

200. "'In § 1983 actions, . . . the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action.'" Hayes v. County of San Diego, 736 F.3d 1223, 1228 (quoting Moreland v. Las Vegas Metro. Police Dept., 159 F.3d 365, 369 (9th Cir. 1998)) (deletions in the original).

201. Therefore, Mr. Sanchez's state and federal claims in life survive his death.

202. Plaintiff Estate claims damages for the pain and suffering unlawfully caused Mr. Sanchez during the events in question until the time of his death.

203. Plaintiff Estate claims damages for the loss of his enjoyment of his life, and for the pain and suffering that led to his death. See, e.g., McClurg v. Maricopa Cnty., CIV-09-1684-PHX-MHB, 2011 U.S. Dist. LEXIS 108943, 2011 WL 4434029 (D. Ariz. Sept. 23, 2011); Berry v. Muskogee, 900 F.2d 1489, 1507 (10th Cir. 1990); Bass v. Wallenstein, 769 F.2d 1173, 1190 (7th Cir. 1985).

204. As a direct and proximate cause of the Defendants' actions, Mr. Sanchez suffered immense physical pain, humiliation, fear, physical injuries, and death.

# COUNT VI

## Plaintiffs (except Plaintiff Estate) v. Defendant TASER®
### Wrongful Death
#### (Pursuant to Arizona State Law)

205. Paragraphs 1- 204 are stated herein by reference.

206. Defendant TASER's actions and products unlawfully caused the Plaintiffs' injuries and the decedent's death.

207. There were no actions brought by the decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

208. Mr. Sanchez died intestate.

209. Plaintiffs bring this action as survivors and claim damages for pecuniary loss suffered by reason of decedent's wrongful death, as well as for reimbursement for medical bills, funeral and cremation expenses, administrative expenses, and other expenses incident to his death, as well as the loss of services and financial care that he would have provided to them.

210. As a direct and proximate cause of the Defendant's actions, the survivor Plaintiffs suffered mental anguish and a loss of companionship, comfort, financial support, and guidance.

**WHEREFORE**, the Plaintiffs respectfully request that judgment be entered in their favor as follows:

A. That this Court declare that the Defendants' actions violated their constitutional and statutory rights;

B. Compensatory damages including but not limited loss of companionship, comfort, financial support, and guidance caused by the death; and the survivor's emotional suffering.

C. Punitive damages (except against the Defendant City);

D. Reasonable attorney's fees and costs;

E. A jury trial; and,

F. Such other financial or equitable relief as is reasonable and just.

## **Jury Trial Demand**

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

_____                    **Date: July 14, 2014**
**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
Counsel for Plaintiffs

**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **L. ALICIA RASCON, et al.,** | : Civil Action No.: CV-14-749-PHX-JJT |
| **Plaintiffs,** | : (Filed: April 10, 2014) |
| | : District Judge: John J. Tuchi |
| **v.** | : |
| | : **CIVIL ACTION – LAW** |
| **CLINTON H. BROOKINS (#9452), et al.,** | : **JURY TRIAL DEMANDED** |
| **Defendants.** | : |

**CERTIFICATE OF SERVICE**

      I hereby certify that on the date listed below I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following person(s):

**Kathleen L. Wieneke, Esquire**
Email: kwieneke@swlfirm.com

**Michael A. Brave, Esquire**
Email: brave@laaw.com

**Christina Gail Retts, Esquire**
Email: cretts@swlfirm.com

**Pamela Beth Petersen, Esquire**
Email: pampetersen@cox.net

**Holly L. Gibeaut, Esquire**
Email: hgibeaut@TASER.com

Served by Email only:

**John T. Masterson, Esquire**
Email: JMasterson@JSHFIRM.com

_____
**DEVON M. JACOB, ESQUIRE**

Date:   July 14, 2014