# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| L Alicia Rascon, *et al.*, | No. CV-14-00749-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Clinton H. Brookins, *et al.*, | |
| Defendants. | |

At issue is Plaintiff Alicia Rascon's Motion for Partial Summary Judgment (Doc. 175, Rascon MSJ), to which Defendant Clinton Brookins filed a Response (Doc. 189, Brookins Resp.), and to which Defendants the City of Phoenix, Jeremy King, Nicholas R. Welch, and Steven Squier (collectively, the "City Defendants") filed a Response (Doc. 197, City Resp.), and to which Rascon filed a Reply (Doc. 204, Rascon Reply). Also at issue are Brookins' Motion for Summary Judgment (Doc. 192, Brookins MSJ) and the City Defendants' Motion for Summary Judgment (Doc. 186, City Defs' MSJ), to which Rascon filed a joint Response (Doc. 208, Rascon Resp.), and to which Brookins and the City Defendants filed Replies (Doc. 216, Brookins Reply, Doc. 218, City Reply). Additionally, Brookins and the City Defendants filed a Joint Notice of Supplemental Authority (Doc. 220). The Court elects to resolve the parties' cross motions for summary judgment without oral argument. *See* LRCiv 7.2(f). For the reasons articulated herein, the Court grants Defendants' Motions as they pertain to Counts II and III of Rascon's Amended Complaint. The Court denies the remainder of Defendants' Motions. For the same reasons, the Court denies Plaintiff's Motion.

# I.    BACKGROUND

This case stems from the death of Jorge Sanchez on the night of April 10, 2012, during an attempt by members of the Phoenix Police Department to take Sanchez into custody. Earlier that evening, two female employees of a Phoenix-area CVS Pharmacy heard an alarm sound on a rear "employees only" door. Upon investigating the cause of the disturbance, one of the pair observed a Hispanic man crouching within the aisles of the store and making "odd movements." (Doc. 193-1 at 2-3, Brookins Separate Statement of Facts ("Brookins SSOF") Ex. 1.) Although the man complied with employees' requests and left the store, he remained in the parking lot, pacing about. (Doc. 193-1 at 2-3, Brookins SSOF Ex. 1.). The employee again approached the man and asked him to leave, which the man did by running across the street. The man's prior behavior, however, prompted a female customer to call 911 to report the incident. (Doc. 193-1 at 2-3, Brookins SSOF Ex. 1.)

A short time later, a woman who had stopped at a red light at the intersection of Thunderbird Road and 19th Avenue observed a jaywalker enter the road behind her car. (Doc. 193-1 at 15, Brookins SSOF Ex. 1.) As she turned onto Thunderbird Road, a white truck accelerated past her with a young man wearing a white shirt and pants standing up in the bed of the truck. (Doc. 193-1 at 15, Brookins SSOF Ex. 1.) As the man in the truck bed began moving about, the truck slowed and swerved from side to side. (Doc. 193-1 at 15, Brookins SSOF Ex. 1.) The man fell out of the truck bed, landing and rolling in the road. (Doc. 193-1 at 15, Brookins SSOF Ex. 1.) He quickly got to his feet and ran northbound, yelling. (Doc. 193-1 at 16, Brookins SSOF Ex. 1.) The woman called the police and provided a description of the man she observed in the truck bed. (Doc. 193-1 at 15, Brookins SSOF Ex. 1; Doc. 193-2 at 3, Brookins SSOF Ex. 4.)

Shortly thereafter, a third incident occurred. As a Phoenix resident living just off Thunderbird Road carried groceries into his home, his wife and daughter entered the house yelling at him to call 911. (Doc. 187-2 at 28, City Defendants' Separate Statement of Facts ("City Defs' SSOF") Ex. 1.) The man went outside to see what caused the

commotion and discovered a man, later identified as Jorge Sanchez, wandering around the yard. (Doc. 187-2 at 28, City Defs' SSOF Ex. 1.) As Sanchez walked away from the house, the caller reported to the operator that he observed Sanchez walking in and out of traffic on Thunderbird Road. (Doc. 187-2 at 29, City Defs' SSOF Ex. 1.)

In response to these three calls, the Phoenix Police Department dispatched officers, including Officer Nicholas Welch, to investigate. (Doc. 193-2, Brookins SSOF Ex. 5, Welch Dep. 6:5-12.) After initially responding to the call from CVS, Welch proceeded to assist officers dispatched to the reported incident on Thunderbird Road. (Welch Dep. 7:5-9.) As Welch approached the scene, he observed Sanchez running eastbound on the sidewalk along Thunderbird Road, waving his arms over his head. (Welch Dep. 7:21-8:1.) Welch determined that Sanchez appeared to match the description given by the initial 911 call from CVS and stopped to speak with Sanchez. (Welch Dep. 8:22-9:10.) Welch stopped his police cruiser, partially blocking traffic in the far right lane, and activated his emergency lights. (Welch Dep. 9:14-10:18.) Welch exited his vehicle and asked Sanchez what had happened. (Welch Dep. 10:25-11:4.) Sanchez said he had been hit by a car. (Welch Dep. 11:5-6.)

At that point a second officer, Jeremy King, arrived on the scene and parked directly behind Welch's vehicle. (Welch Dep. 11:9-14; Doc. 193-1, Brookins SSOF Ex. 3, King Dep. 38:15-19.) As King approached the pair, Sanchez began telling the officers that he could not walk. (Welch Dep. 11:14-20, King Dep. 38:21-23.) Sanchez then stepped out into the road and fell to the ground. (Welch Dep. 11:14-20, King Dep. 38:21-23.) The officers directed Sanchez to leave the roadway because he was exposed to passing traffic. (Welch Dep. Ex. 3, King Dep. 38:24-39-3.) At the same time, Officers Clinton Brookins and Steven Squier pulled up in a third marked car to provide further support. (Doc. 193-1, Brookins SSOF Ex. 2, Brookins Dep. 44:6-20.)

What happened next remains in dispute, and the testimony of the four officers, who are the only surviving witnesses to the event, portray substantially different accounts of the event. In his deposition, Welch testified that he and King each grabbed one of

Sanchez's arms and physically assisted him to the sidewalk. (Welch Dep. 20:3-14.) After Welch and King moved Sanchez to the sidewalk, Sanchez attempted to break free from the pair and began swinging his closed fists at them. (Welch Dep. 28:3-29:22.) As Welch and King struggled to control Sanchez, Brookins approached and tackled Sanchez to the ground. (Welch Dep. 32:21-33:9.) With Sanchez face down on the ground, the officers then attempted to place handcuffs on him. (Welch Dep. 39:5-7.) Sanchez, however, resisted these efforts despite the officers' verbal commands. (Welch Dep. 39:11-22.) He pushed himself up onto his hands and knees despite all four officers applying pressure to keep him down. (Welch Dep. 39:15-22.) Welch delivered two knee strikes to Sanchez's upper right rib cage in an attempt to gain "pain compliance." (Welch Dep. 40:3-10.) Sanchez, however, managed to still get to his feet, leading King to deploy his taser.

According to King, however, Sanchez sat down on the curb after King and Welch assisted him out of the roadway. (King Dep. 51:2-6.) At that time, Brookins and Squier arrived and the four attempted to keep Sanchez calm. (King Dep. 51:3-6.) King recalls that he gently put his arm on Sanchez's shoulder urging him to wait for the fire department; however, Sanchez rose to his feet and attempted to strike King at waist height. (King Dep. 51:7-12, 53:15-24.) As King dodged the blow, the officers grabbed Sanchez, forcing him to the ground. (King Dep. 54:19-56:3.) The officers then attempted to cuff Sanchez, who began kicking at them in an effort to resist. (King Dep. 58:8-12.) Despite their efforts, the officers failed to secure Sanchez, who managed to push the weight of all four officers off of him and stand back up. (King Dep. 58:8-17.) At that point, King decided to use his taser to subdue Sanchez. (King Dep. 58:15-17.)

Brookins' testimony also paints a different picture of the encounter. Brookins recalled that he arrived to the scene with Squier to find Welch and King interacting with Sanchez in the road. (Brookins Dep. 50: 14-21.) Brookins then ran into the road to provide back-up for Welch and King, and the three convinced Sanchez to move to the curb—unassisted—where Sanchez sat down. (Brookins Dep. 52:8-54:10.) Sanchez immediately attempted to stand up, which caused Brookins to put his hand on Sanchez's

shoulder, telling him to "have a seat" and "relax." (Brookins Dep. 56:3-6.) Brookins then turned his head to look at a car squealing its tires nearby. (Brookins Dep. 57:17-22.) When his gaze returned to the situation at hand, Sanchez was standing. (Brookins Dep. 57:17-22.) Sanchez then lunged at the officers standing by the street. As Sanchez began his lunge, Brookins used both hands to grab and pull back Sanchez by his shirt. (Brookins Dep. 60:1-11.) During the same sequence, Sanchez swung his fist at the officers near the curb. (Brookins Dep. 59:13-60:12.) Still gripping Sanchez's shirt, Brookins swung Sanchez to the side sending him to the ground where Brookins attempted to place him in handcuffs. (Brookins Dep. 60:4-20.) Brookins struggled on the ground to secure Sanchez's arms, but Sanchez managed to push up off the ground, shedding all 270 pounds of Brookins as he did so. (Brookins Dep. 61:6-16, 64:13-23.) Sanchez then spun free of Brookins and began running away from the officers. (Brookins Dep. 64:17-20, 71:20-21.) As Brookins testified, it was at that moment, as Sanchez fled away from the officers, that an officer deployed his taser to subdue Sanchez. (Brookins Dep. 72:5-9.)

Finally, Squier testified that Sanchez was seated on the curb when Squier arrived on scene with Brookins. (Doc. 193-2, Brookins SSOF Ex. 6, Squier Dep. 27:20-24.) According to Squier, Sanchez tried to stand up at some point, causing Squier to place a hand on his shoulder telling him to "just chill." (Squier Dep. 29:2-11.) Moments later, Sanchez rolled to his right and began crawling away from the officers on all fours. (Squier Dep. 29:13-30:10.) This caused the officers to "t[ake] a position" on Sanchez, positioning him flat on his stomach with Squier taking hold of one of his arms. (Squier Dep. 30:2-31:22.) Sanchez then made a guttural, spitting noise and turned his head to face Squier, causing Squier to lose his grip on the arm. (Squier Dep. 33:2-34-6.) With officers still applying pressure to his body on all sides, Sanchez then pushed himself up off his stomach with what Squier described as a display of "superhuman strength" and stood up. (Squier Dep. 34:7-35:9.) Sanchez then began walking away quickly, leading the

officers to deploy a taser. (Squier Dep. 37:1-5.) Up until that point, Squier does not recall Sanchez attempting to strike a fellow officer. (Squier Dep. 37:6-12.)

Despite the differences in the events leading to the officers' attempt to seize Sanchez, each version arrives at a similar conclusion. After King fired his taser, Sanchez took off running and the officers gave chase. Brookins was the first to reach Sanchez and brought him to the ground in an attempt to restrain him. As Brookins struggled with Sanchez, King delivered an additional cycle with his taser before he and Welch attempted to assist Brookins in restraining Sanchez.

As the officers cuffed Sanchez, Squier contacted dispatch to notify a supervisor that a taser was deployed and to inform the fire department that the officers needed assistance. (Squier Dep. 55:5-21.) With Sanchez restrained, Brookins rose from the ground to catch his breath. (Brookins Dep. 105:20-106-1.) However, he soon noticed that Sanchez was drooling and checked his pulse, finding that it was weak. (Brookins Dep. 107:13-19.) The officers removed the cuffs from Sanchez's wrists and an officer initiated chest compressions. (Brookins Dep. 108:23-109:1.) After donning his protective gloves, Brookins relieved the officer administering aid. (Brookins Dep. 110:9-13.) Brookins checked Sanchez's airway for signs of breathing before immediately delivering chest compressions, which he continued for two to three minutes until the fire department arrived on the scene. (Brookins Dep. 29:6-9, 110:9-13.) Sanchez was then taken from the scene to the hospital where doctors pronounced him dead at 10:55 pm. (Doc. 193-3, Brookins SSOF Ex. 8, Autopsy Report at 2.) The medical examiner's office later performed an autopsy that revealed a concentration of 1.64 mg/L of methamphetamine in his system. (Autopsy Report at 2.)

Plaintiffs Juan Sanchez, Toni Marquis, on behalf of A.M., and Alicia Rascon, in her individual capacity and as the personal representative of Jorge Sanchez's estate, filed suit in this Court naming as Defendants Brookins, King, Welch, Squier, the City of Phoenix, and Taser International, Inc. (*See* Doc. 1, Compl.) Plaintiffs later filed an Amended Complaint, which alleged six causes of action: 1) a claim by Sanchez's estate

under 42 U.S.C. § 1983 against Brookins, King, Welch, and Squier for their alleged violations of Sanchez's Fourth Amendment right to be free from excessive force; 2) a § 1983 claim by Sanchez's estate for the officers' alleged violation of Sanchez's Fourteenth Amendment due process rights; 3) a § 1983 claim by Plaintiff's estate against the City of Phoenix for alleged violations of Sanchez's Fourth and Fourteenth Amendment rights; 4) a state law products liability claim against TASER; 5) a survival action against all Defendants pursuant to § 1983 and Arizona law; and 6) a wrongful death action by Juan Sanchez, Marquis, and Rascon against TASER. (Am. Compl ¶¶ 139–210.)

Subsequently, the Court dismissed Juan Sanchez's claims (Doc. 36) and the remaining Plaintiffs stipulated to the dismissal of TASER from the action, resolving the claims between Plaintiffs and TASER (Doc. 73). Thus, at this stage, the claims that remain are those asserted by Jorge Sanchez's estate against the City of Phoenix, Brookins, King, Welch, and Squier.

## II.    LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not

merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

The Individual Defendants each move for summary judgment on Counts I and II of the Amended Complaint. The City, in turn, moves for summary judgment as to municipal liability claims in Count III of the Amended Complaint. Plaintiff moves for partial summary judgment on Counts II and III of the Amended Complaint. The Court starts with the Individual Defendants' Motion on Count I before moving to the cross-motions on the remaining counts of the Amended Complaint.

### A. Count I: Excessive Force

The individual officers move for summary judgment on Count I of the Amended Complaint, arguing that their use of force was reasonable in light of the circumstances faced during their encounter with Sanchez. (City Defs' MSJ at 8-15; Brookins MSJ at 10-15.) In the alternative, Defendants argue that they are entitled to qualified immunity on Plaintiff's excessive force claims. (City Defs' MSJ at 17-19; Brookins MSJ at 15-20.)

Excessive force claims arising "in the context of an arrest" are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City*

*of Orange*, 485 F.3d 463, 477 (9th Cir. 2007). However, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97. Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Whether force is "objectively reasonable" depends on several factors, including: (1) "the severity of the crime that prompted the use of force"; (2) "the threat posed by a suspect to the police or others"; and (3) "whether the suspect was resisting arrest." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (quoting *Graham*, 490 U.S. at 397).

Because excessive force cases require balancing the intrusion on the plaintiff's Fourth Amendment right with the countervailing government interest, "summary judgment . . . should be granted sparingly" and the question left for a jury. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Courts should be particularly wary of granting a summary judgment motion when the alleged victim died during an encounter with officers. *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 n.3 (9th Cir. 2014). In such a case, the Court must "examine whether the officers' accounts are 'consistent with other known facts'" before determining that no factual dispute exists. *Id.* at 1079 n.3 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).[1]

---

[1] *Cruz* does not, as Plaintiff suggests, stand for the proposition that an officer's factual testimony is automatically in dispute when the officer is involved in an alleged excessive force event ending in death. If Plaintiff's interpretation were accepted, courts would be unable to *ever* grant summary judgment in such a case. Rather, *Cruz* stands for the proposition that an officer's testimony is to be strenuously compared to other evidence to determine whether it is consistent. Plaintiff's miscomprehension of this principle is evident when looking at many of her controverting statements of fact. Plaintiff *repeatedly* responds to Defendants' Statements of Fact with the following statement:

> ADMITTED in part; DENIED in part. Admitted only that Defendant [] testified as indicated. Since the Defendants caused Sanchez's death, the truthfulness of their testimony will need to be determined by the jury.

(*See, e.g.*, Doc. 205, Rascon Separate Statement of Controverting Facts ("Rascon SSOCF") ¶ 17.) Plaintiff's responses are inexcusable not only because they are premised

Plaintiff's account of the officers' encounter with Sanchez alleges an array of acts by each of the officers. These acts include:

> (1) throwing Sanchez to the ground, (2) delivering two knee-strikes to his ribs with force sufficient to break three ribs, (3) repeatedly tasering him in the heart for 53 of 59 seconds and continuing to activate the taser after handcuffing, (4) applying two carotid neck holds, (5) applying full bodyweight to Sanchez's back while he was on his stomach, (6) handcuffing Sanchez to the rear, and (7) folding Sanchez's legs up behind his back.

(Rascon Resp. at 8.) The encounter between Sanchez and the officers, however, evolved over a several minutes with a set of changing circumstances that impacts this Court's analysis under *Graham*. Therefore, the Court will analyze Plaintiff's claims in two distinct phases for the purpose of the summary judgment motions. *See, e.g., Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1145–46 (E.D. Cal. 2016). For the purposes of this Order, the Court will first analyze the acts alleged in Phase I, which runs from when the officers first found Sanchez to when Sanchez first escaped the officers' grasp. Phase II then encompasses the period after Sanchez's escape through the officers' ultimate seizure of Sanchez.

### 1. Phase I: Initial Seizure of Sanchez

#### a. Quantum of Force

The Court's *Graham* inquiry begins with an assessment of the "quantum of force used" by each defendant. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001)). During this phase of the encounter, Plaintiff contends that all four Defendants "piled onto Sanchez's back" and that Welch delivered two blows with his knee to Sanchez's chest with sufficient force to break his ribs. (Rascon Resp. at 6.) In the summary judgment motions, Defendants do not dispute that all four officers took Sanchez to the ground and that

---

on an unproven legal conclusion as to the cause of Sanchez's death, but because they openly flout this Court's Local Rule for controverting facts. *See* LRCiv 56.1(b). When a party disputes a statement of fact, it must make "reference to the specific admissible portion of the record supporting the party's position if the fact is disputed." *Id.* Plaintiff's responses are neither specific, nor do they demonstrate that the fact is in dispute. Instead, Plaintiff attempts to place the burden on this Court to make her case for her.

Welch delivered two knee strikes (*see* City Defs' MSJ at 12); instead, they largely argue that the level of force used was low because Sanchez suffered *de minimis* injury from the takedown and strikes.

The Court disagrees with Defendants' characterization at this stage, particularly given evidence from Sanchez's autopsy revealing three fractured ribs. (Autopsy Report at 8.) The City Defendants dismiss this evidence by arguing that Plaintiff has no admissible expert testimony to prove that Welch's knee strikes caused the fracture. (City Defs' MSJ at 12.) Defendants cite to *Schudel v. General Electric Co.*, 35 F. App'x 481 (9th Cir. 2002)—an unpublished, non-precedential opinion—in support of this proposition. The Court, however, remains unconvinced and can find "no legal authority requiring expert testimony on causation in a § 1983 action." *See Mbegbu v. City of Phoenix*, No. 16-CV-00434-DGC, 2017 WL 4679260, at *9 (D. Ariz. Oct. 18, 2017). At best, *Schudel* supports the proposition that expert testimony is required when "injuries involve[] obscure medical factors" that would prevent the average juror from determining the cause. *Schudel*, 35 F. App'x at 484. Nothing about the nature of a broken rib strikes this Court as "obscure." Defendants concede that they took Sanchez to the ground and that Welch used his knee to strike Sanchez twice in the ribs. Sanchez's autopsy revealed three broken ribs on that side of his body. Additionally, Sanchez's autopsy additionally revealed abrasions over Sanchez's head, face, arms, and legs. (Autopsy Report at 3-5.) Such evidence is sufficient at summary judgment for the Court to conclude that the officers' force during Phase I was non-trivial.

### b. Severity of the Crime at Issue

Next, courts must consider the "severity of the crime at issue," *Graham*, 490 U.S. at 396; however, when an officer is acting in his "community caretaking capacity," courts should also look to "the nature of the ongoing emergency" created by the suspect's actions, *Ames v. King Cty., Wash.*, 846 F.3d 340, 348-49 (9th Cir. 2017). Defendants argue that this factor supports the use of force because Sanchez was high on methamphetamine and committed aggravated assault by attempting to strike the officers.

(City Defs' MSJ at 9; Brookins MSJ at 12.) Portions of the record, however, raise questions about that portrayal. In contrast to Defendants' argument that the Sanchez had committed a number of serious crimes, Welch, who was the first officer to interact with Sanchez, testified that he "was not aware of any crime" that Sanchez committed prior to Sanchez allegedly throwing a punch. (Welch Dep. 26:4-5.) Instead, the officers' initial interactions with Sanchez indicate that they believed that Sanchez had been struck by a car. (Welch Dep. 8:22-25, 11:5-20.) Further, although the officers believed Sanchez's behavior to be erratic, it is not clear that they had reason to believe that drug use was the cause of that behavior. (Welch Dep. 16:7-18.)

And, although Defendants argue that Sanchez attempted to punch the officers, Plaintiff has put forth sufficient evidence to dispute this point. Defendants' evidence on this point is substantial, but Squier's testimony creates sufficient doubt at the summary judgment stage. Squier recalls neither Sanchez attempting to throw a punch nor any officer verbalizing that Sanchez had done so. (Squier Dep. 30:17-19.) In his Reply, Brookins argues this testimony is insufficient to create a genuine issue of material fact because failing to see something happen does not equate to that act not occurring. (Brookins Reply at 6 n.4.) Defendants are free to argue that point to the jury, but Squier's testimony is sufficient to create a triable issue, particularly given Sanchez's inability to testify in this matter. *See Cruz*, 765 F.3d at 1079. The narratives of Brookins, Welch, and King all point to this attempted assault as the catalyst for the use of force against Sanchez. Despite standing within arms-length of Sanchez as the officers moved to seize him, Squier doesn't recall that punch or any mention of the punch. (Squier Dep. 29:2-10.) This alone creates sufficient inconsistency in the accounts to survive summary judgment.

In contrast to Brookins' argument, Squier's account provides a relatively complete picture of Sanchez's actions from his time on the curb to the point at which the officers initially applied force. As Squier testified, Sanchez attempted to stand up off the sidewalk causing Squier to place his hand on Sanchez's shoulder telling him to "just chill." (Squier Dep. 29:2-8.) At that point, the officers did not have reason to forcibly seize Sanchez.

Sanchez complied with Squier's command momentarily before rolling to his right and crawling away. (Squier Dep. 29:13-30:19.) Squier claims it was at that point that all four officers then "took a position" on Sanchez. (Squier Dep. 30:2-5.) If the finder of fact were to credit Squier's testimony and discount that of Brookins, King, and Welch, no gap in time exists where Squier plausibly would not have seen the punch.[2] Therefore, Plaintiff presents sufficient evidence to show that Sanchez did not throw the punch for the purpose of summary judgment.

Finally, the City Defendants argue that, regardless of the severity of any crime that Sanchez committed, the interest under *Graham*'s first factor was substantial because the officers were "attempting to remove Sanchez from danger and provide medical help." (City Defs' MSJ at 9.) Defendants' citation to *Ames* in support of their argument is inapposite in this case. In *Ames*, a group of police officers accompanied paramedics responding to a drug overdose. 846 F.3d at 344. The victim's mother refused to allow the police to enter her home while the paramedics treated her son. *Id.* Concerned for the safety of emergency personnel, the officers directed the paramedics to remain outside unless the officers were also allowed to enter. *Id.* After continuing to deny the officers' request, the mother attempted to move her son outside so that she could drive him to the hospital. *Id.* As she loaded her son into the car, an officer blocked the driveway before approaching the driver's side door to pull the mother out of the vehicle. *Id.* The mother resisted, forcing the officer to pull her out by her hair. The officer then took the mother to the ground by the hair and pinned her to the ground with a knee before cuffing her. *Id.* In finding the officer's use of force reasonable, the court focused on the fact that the mother's actions "prolong[ed] a dire medical emergency" and "risked severe consequences" for her son rather than the relatively minor misdemeanor of obstruction.

---

[2] Brookins' argument relies on Squier's testimony that he was not focused on Sanchez's hand and thus would not have seen an attempted strike (Brookins Reply at 6 n.4.). Although Squier did testify that he was focused solely on his "portion of Sanchez," that testimony references the portion of the encounter after the officers initially seized Sanchez. (Squier Dep. 36:13-37:18.) Thus, it is irrelevant to the question of whether, as the other three officers testify, Sanchez threw a punch prior to the officers taking hold of him.

*Id* at 348-49. Thus, *Ames* supports an office's use of significant force, despite a relatively insignificant crime, when an individual's actions endanger the health and safety of others.

Defendants, however, extend this logic to support the use of force against the very individual suffering a medical emergency. *Ames* does not reach that far. Under Plaintiff's version of the facts, the most significant emergency exacerbated by Sanchez's actions was his own. As Defendants have testified, they detained Sanchez in large part to get him medical attention because he claimed a car hit him. (Welch Dep. 11:5-7.) This is not to minimize the relative danger of the situation. The record does reflect that the bulk of the incident took place near a busy street, subjecting the officers to the danger of oncoming traffic; however, evidence also shows that the officers had blocked the near lane with their vehicles and had moved Sanchez to the sidewalk. (Welch Dep. 9:14-16.)

It is the jury's task, rather than this Court's, to weigh the evidence. For the purpose of summary judgment, the Court finds that a jury could reasonably determine that, at the initial point the officers employed force, (1) Sanchez had not committed any crime and (2) the extent of the emergency was relatively low because the officers blocked the closest lane of traffic and moved Sanchez from the street to the sidewalk. As such, *Graham*'s first factor weighs against the reasonableness of the officers' force.

### c.    Immediate Threat to the Officers

*Graham*'s second, and most crucial, factor looks to the "immediate threat" posed by the suspect "to the safety of the officer or others." *Bryan*, 630 F.3d at 826–28 (citing *Smith*, 394 F.3d at 702); *see also S.B. v. Cty. of San Diego*, 864 F.3d at 1010, 1013-14 (9th Cir. 2017). This requires that the defendant point to "objective factors to justify such a concern" rather than "a simple statement . . . that he fear[ed] for his safety." *Deorle*, 272 F.3d at 1281. However, the "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* at 1281. "[D]ealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal," typically warrants a lesser degree of force. *Glenn v. Washington*

*Cty.*, 673 F.3d 864, 877 (9th Cir. 2011) (citing *Deorle*, 272 F.3d at 1282). "This is because when dealing with a disturbed individual, 'increasing the use of force may . . . exacerbate the situation," unlike when dealing with a criminal, where increased force is more likely to "bring[] a dangerous situation to a swift end." *Glenn*, 673 F.3d at 877 (citing *Deorle*, 272 F.3d at 1282). Again, a factual dispute remains as to the threat posed by Sanchez to the officers during the initial encounter.

The City Defendants argue that Sanchez's actions earlier in the night establish that he was a significant threat to the officers. (City Defs' MSJ at 10.) In particular, Defendants point to the fact that Sanchez had jumped into the back of a truck and had lain down in a nearby driveway. (City Defs' MSJ at 10.) However, facts in the record indicate that the officers had not connected Sanchez to those incidents at the time of the encounter. Even if Defendants are correct about Sanchez's actions earlier in the night, the inquiry is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Additionally, as Squier testified, Sanchez did not attempt to attack any of the officers prior to his seizure. (Squier Dep. 30:17-31:7.) Given this testimony, a jury could determine that Sanchez initially posed little threat to the officers. Thus, the Court weighs this factor against the officers' use of force.

### d.  Flight or Resistance

Finally, the parties dispute the extent to which Sanchez resisted the officers' attempts to restrain him during the initial phase of the encounter. When assessing the reasonableness of force, courts "draw[] a distinction between passive and active resistance" by an individual. *Bryan*, 630 F.3d at 830. On one side of the spectrum, active resistance may support the use of substantial force. *Id*. On the other hand, although "purely passive resistance can support the use of some force," the appropriate level of force depends "on the factual circumstances underlying that resistance." *Id.* at 630. Nevertheless, passive resistance almost always warrants "a lesser degree of force" than active resistance. *Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017) (*en*

*banc*). Further, "an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance,'" thus reducing the reasonableness of force used in response to such resistance. *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011) (quoting *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001)).

In support of their motions for summary judgment, Defendants argue that the evidence demonstrates "that Sanchez was actively resisting arrest from the moment he attempted to strike Sergeant King, while fleeing arrest, and until he was finally handcuffed." (City Defs' MSJ at 11; Brookins MSJ at 14.) Plaintiff, however, argues that any resistance by Sanchez was a mere "attempt to get air" while the officers forced him into the ground. (Rascon Resp. at 8.) For the purposes of Phase I, the Court focuses on Sanchez's resistance from the start of the encounter through the period in which Sanchez was first on the ground. Taking Plaintiff's facts as true, Sanchez rolled to his side and crawled away from the officers. (Squier Dep. 29:13-30:5.) The officers then forced Sanchez into the ground as they attempted to control Sanchez's arms. (Squier Dep. 31:1-17.) Although Plaintiff does not create a genuine dispute about Sanchez's failure to submit to the officers, a jury may find that this initial resistance was reasonable given the officers' rapid seizure of Sanchez. *See Young*, 655 F.3d at 1164 (finding officer's unexpected use of pepper spray sufficiently provocative to justify reasonable resistance); *Blankenhorn*, 485 F.3d at 479-80 ("The lack of forewarning, swiftness, and the violence with which the defendant officers threw themselves upon [the plaintiff] could reasonably be considered 'provocative' . . . ."). Therefore, the Court weighs this factor against the officers' use of force during Phase I.

### e. Balancing the Level of Intrusion Against the Government's Interest

Taking the evidence in the light most favorable to Plaintiff, Sanchez (1) had not committed any crime, (2) did not exacerbate any emergency other than his own, (3) did not pose an immediate risk to the officers, and (4) resisted passively, if at all. Weighing

the force used by all four officers against the government's interest, a finder of fact could determine that Welch's use of knee strikes and the officers' act of pressing Sanchez into the ground constituted an unreasonable amount of force in violation of Sanchez's constitutional rights. *See, e.g., Blankenhorn*, 485 F.3d at 479-80 (finding that officers' use of a gang tackle and punches to suspect's ribs raised triable issue of fact when suspect was passively resisting).

### f. Qualified Immunity

This, however, does not end the Court's inquiry into Phase I, as the officers also move for summary judgment on the basis of qualified immunity. The defense of qualified immunity shields state officials from suits for damages unless a plaintiff establishes "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established at the time of the challenged conduct.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An officer "violates clearly established law when, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although a case need not be "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741. When factual disputes exist, summary judgment is appropriate only if the defendant is entitled to qualified immunity under the facts most favorable to the plaintiff. *Blankenhorn*, 485 F.3d at 477-78.

Having established that a trier of fact could find Welch's use of knee strikes and the officers' use of their body weight to press Sanchez into the ground to be objectively unreasonable, the Court must determine whether Sanchez's right to be free of such force was clearly established at the time the force was used. *See Al-Kidd*, 563 U.S. at 735. Plaintiff cites to *Blankenhorn* to support a finding that the Defendants were on notice that their actions during this stage of the encounter violated clearly established law. (Rascon Resp. at 12.) In *Blankenhorn*, officers attempted to arrest an individual suspected of a

relatively minor misdemeanor. 485 F.3d at 478. After the suspect refused commands to kneel, three officers gang-tackled him and brought him to the ground. *Id.* As the officers attempted to place the suspect in cuffs, one officer punched the suspect's chest several times to gain control of the suspect's arm. *Id.* at 480. Crediting the plaintiff's account, the court determined that a jury could find the gang-tackle and punches objectively unreasonable when the crime at issue was minor, the suspect posed little threat to officers, and was not actively resisting arrest. *Id.* at 478, 480-81. More importantly, the court rejected the defense of qualified immunity stating the rights were clearly established at the time of the incident, which took place in 2001. *Id.* at 480-81

Defendants, however, argue that Plaintiff's reliance on *Blankenhorn* is misplaced because the plaintiff in that case "did not commit a serious crime, resist or evade arrest, or pose an immediate threat." (City Defs' Resp. at 12.) Thus, as Defendants argue, "the case[ is] inapposite because [it] do[es] not involve 'an officer acting under similar circumstances.'" (City Defs' Resp. at 12.) Because the Court must perform its qualified immunity inquiry based on the facts most favorable to Plaintiff, *see id.*, Defendants' argument undercuts their position. As the Court has stated, a jury could reasonably find that the officers were not aware of a crime that Sanchez committed, that Sanchez did not actively resist, and that Sanchez did not pose an immediate threat.

Given that factual predicate, the Court observes the Ninth Circuit's repeated recognition that the "right to be free from the application of non-trivial force for engaging in mere passive resistance" is clearly established. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *see also Young*, 655 F.3d at 1168 ("The principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety and could be found not to have resisted arrest, was thus well-established in 2001 . . . ."). Therefore, the Court concludes that the officers are not entitled to qualified immunity on summary judgment for the alleged uses of force during Phase I. Significant factual disputes remain to be resolved at trial.

Accordingly, the Court denies Defendants' motions on Count I as they pertain to all four officers' initial seizure of Sanchez.

### 2. Phase II: Use of Taser, Carotid Hold, and Restriction of Sanchez's Legs

In Phase II of the encounter, Plaintiff alleges the following uses of force: 1) the use of a taser to Sanchez's left chest; 2) "pressure to [Sanchez's] neck, airway, and carotid artery that limited or cut off air and blood flow"; and 3) "hogtying and handcuffing Mr. Sanchez while he was lying face-down on a hard surface." (Am. Compl. ¶ 141.) Defendants again move for summary judgment, arguing that the force was objectively reasonable, and, in the alternative, that they are entitled to qualified immunity.

#### a. Quantum of Force

The use of a taser, such as the X26, generally "fall[s] into the category of non-lethal force." *Bryan*, 630 F.3d at 825. Still, the use of a taser in dart mode causes significant "physiological effects," inflicts "high levels of pain," and creates a "foreseeable risk of injury." *See id.* Thus, courts treat such a use as "an intermediate, significant level of force." *Id.* at 826. However, when an officer discharges a taser multiple times for a continued duration, courts may find that such conduct "raise[s] the 'quantum of force.'" *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1131 n.4 (9th Cir. 2017).

Likewise, a carotid hold is a control technique designed to quickly incapacitate a suspect. (Doc. 187-3, City SSOF Ex. 6, Phoenix Police Department Operations Order 1.5 ("PPD Operations Order 1.5") at 11.) To apply the hold, an officer wraps his arm around the suspect's neck, using pressure from the forearm and bicep to simultaneously compress the carotid artery on each side of the neck. (Doc. 187-4 at 97, City SSOF Ex. 10, PPD Lesson Plans.) Once applied, the hold reduces the flow of oxygenated blood to the brain and may result in unconsciousness within seconds. (Doc. 187-4 at 95-96, City SSOF Ex. 10, PPD Lesson Plans.) Because of the potential effect on the subject of such a

hold, the City of Phoenix limits the use of the carotid hold to "those situations where violent resistance is encountered or where death or serious bodily harm will result to the officer" and expressly warns officers that "irreparable brain damage may occur" if applied at length. (City SSOF Ex. 6, PPD Operations Order 1.5 at 11.) The City further restricts its officers from using the technique "more than once on the same subject because of the possibility of progressive injury." (City SSOF Ex. 6, PPD Operations Order 1.5 at 12.) Accordingly, the use of the carotid hold may constitute a significant use of force and threatens serious injury when applied multiple times.

In support of the motions, Defendants argue that uncontroverted evidence shows both that the taser failed to harm Sanchez, (City Defs' MSJ at 13), and that Brookins only applied pressure to Sanchez's jaw rather than employing a carotid hold, (Brookins MSJ at 11). In particular, Defendants argue that King's use of a taser was not a significant use of force because it "had absolutely no effect on Sanchez." (City Defs' MSJ at 13.) The record suggests otherwise. First, evidence in the record demonstrates that the probes of King's taser impacted and penetrated the skin on Sanchez's chest. (Brookins SSOF Ex. 8, Autopsy Report at 4.) After the taser impacted Sanchez's chest, Sanchez screamed and turned to run. (King Dep. 29:18-20.) While the taser did not incapacitate Sanchez, his reaction suggests that it had a significant effect on him. Indeed, as King testified, despite the taser's failure to incapacitate Sanchez, he believed that continuing to cycle the taser might cause "compliance . . . through causing the suspect pain." (King Dep. 64:12-14.) Most importantly in this case, the evidence does not reflect a standard five-second taser cycle. Rather, the log from King's taser shows three activations in a one minute period, with the taser cycling for 53 seconds of that minute. (Rascon SSOCF Ex. 7, Taser Log) Further, King's testimony suggests that the taser cycled from the moment he initially fired it through the point at which the officers finally handcuffed Sanchez. (King Dep. 80:7-11.)

Brookins argues that "[t]he record is uncontested that [the] application of force . . . did not restrict Sanchez's blood or airflow in any way." (Brookins MSJ at 14.) That is not

the case. As the Police Report and autopsy indicate, Brookins initially told medical personnel on the scene that he had employed two carotid holds in an attempt to subdue Sanchez. (See Doc. 187-2 at 179, City Defs' SSOF Ex. 1, Professional Standards Bureau Report ("PSB Report"); Brookins SSOF Ex. 8, Autopsy Report at 2.) Dr. Davenport, who performed Sanchez's autopsy, testified that the bruising and trauma around Sanchez's neck during the autopsy was consistent with the application of a carotid hold. (Doc. 193-2, Brookins SSOF Ex. 7, Davenport Dep. 103:15-18.) Those two pieces of evidence create a sufficient factual dispute at the summary judgment stage. Although Defendants are correct that a plethora of evidence in the record supports a finding that Brookins did not apply a carotid hold, the Court must view the facts in the light most favorable to Plaintiff. Accordingly, a jury could reasonably conclude that Brookins did in fact apply a carotid hold twice.

On these facts, the force used during Phase II was substantial and created a significant risk of injury to Sanchez, particularly considering that a jury could determine that at a certain point the officers were simultaneously tasing Sanchez, applying a carotid hold to his neck, and pinning his legs behind his back. *See Jones*, 873 F.3d at 1132-33 ("[C]ontinuous, repeated, and simultaneous tasings . . . can only be justified by an immediate or significant threat of death or serious physical injury."). Therefore, for the purpose of the motions for summary judgment, the Court finds that the officers used a significant level of force capable of causing Sanchez serious injury.

### b. Severity of the Crime

Turning to the first *Graham* factor, the Court's analysis does not materially change for the purpose of analyzing the alleged uses of force in Phase II of the encounter. Although the extent of Sanchez's resistance increased during this phase, no facts undisputedly show that the officers became aware of any crime during this phase. Similarly, a finder of fact could still reasonably find that Sanchez had not attempted to strike or attack any of the officers, thus negating Defendants' argument that Sanchez

committed assault. Therefore, the Court weighs this factor against the level of force used by the officers during Phase II of the encounter.

### c. Threat to the Officers

Turning to the next factor, Defendants again argue that Sanchez posed a significant threat to the safety of the officers and others because of his "uncanny strength from the methamphetamine-induced psychosis," his attempt to "flee[] down the street, forcing officers to chase after him," and his "kicking and flailing." (City Defs' MSJ at 11; Brookins MSJ at 14). On the facts most favorable to Plaintiff, however, the Court does not agree that the threat posed by Sanchez warrants the level of force used by Defendants.

Although under all versions of the facts, Sanchez managed to escape from the grasp of the officers and move from his stomach to his feet, questions remain about the threat this posed to the officers. In particular, Plaintiff presents evidence in the form of her police policies expert who testified that a reasonable officer would have perceived Sanchez's struggle as "passive resistance" and understood that he "was not . . . a threat." (Doc. 206-12, Rascon SSOCF Ex. 12, Roger Clark Expert Report ("Clark Report") at 12.) The testimony of two officers supports this characterization. As Squier testified, with the officers still attempting to handcuff Sanchez, Sanchez did "a pushup from the chest . . . with all of [the officers] at least trying to control a certain portion of his body." (Squier Dep. 34:8-15.) Sanchez then got to his feet. (Squier Dep. 34:15.) Welch tells a similar story stating that Sanchez was "not complying" and "tensing up." (Welch Dep. 39:15.) Sanchez was then able to "get to all fours" and "able to push us all up." (Welch Dep. 39:15-22.)

The Court in no way doubts the severity of the situation in which Sanchez placed the officers through his noncompliance. Despite the efforts of four trained officers to restrain him, Sanchez was undisputedly able to break free from their grasp and rise to his feet. Nevertheless, facts favorable to Plaintiff indicate that Sanchez did not pose a serious threat because he did not aggressively advance on the officers or attempt to attack them after breaking free. *See, e.g., Lopez v. City of Imperial*, No. 13-cv-00597-BAS(WVG),

2015 WL 4077635, at *12 (S.D. Cal. July, 2, 2015) (finding no serious threat by plaintiff who escaped officer's attempt to wrestle him to the ground but who did not attempt to strike or harm officers). Instead, Sanchez merely stood up to face the officers before King deployed his taser. Similarly, after being struck by the taser, is it undisputed that Sanchez screamed and ran away from the officers.[3] Yet, he did not become belligerent or lash out at officers. Moreover, although Defendants suggest that Sanchez created a threat to others nearby by running in the road, the testimony of at least one officer suggests that Sanchez ran away along the sidewalk, (Welch Dep. 49:9-12), which mitigates the danger posed by or to nearby traffic. Accordingly, although the facts justify the use of some force, a jury could reasonably find that the danger posed by Sanchez during Phase II of the encounter weighed against the significant force used by the officers.

### d.     Flight or Resistance

Finally, the evidence undisputedly reflects that Sanchez exhibited at least some level of resistance during Phase II. The parties, however, dispute whether Sanchez was voluntarily resisting arrest or reacting in response to the officers' uses of force. Although Defendants again argue that undisputed facts show Sanchez "was actively resisting arrest" during the entirety of the encounter, (Brookins MSJ at 14; City Defs' MSJ at 11), the version of the facts most favorable to the Plaintiff portrays a diminished level of resistance. As stated above, Sanchez did not attack the officers, but merely resisted their attempt to seize him. As Plaintiff's expert, Roger Clark, testified, a reasonable officer would have perceived this as "defensive resistance," which warrants a lesser degree of force under the City's own use of force policy. (Clark Report at 12.)

Further, although the undisputed facts show that Sanchez began running away from Defendants, a jury could reasonably find that such a response was, in part, a reaction to being struck by King's taser. Indeed, as Welch testified, Sanchez stood and

---

[3] Although Plaintiff suggests that Sanchez walked away after being struck by the taser, that account is unsupported by the record and mischaracterizes the testimony of Squier. (See, e.g., Doc. 205, Rascon SSOCF ¶ 46.) While Squier testified that Sanchez was walking away from the officers *prior* to King deploying his taser, Squier consistently testified that Sanchez ran after the taser struck him. (See Squier Dep. 50:18–22.)

faced the officers after escaping. Only when King's taser impacted Sanchez "in his upper torso" did he "turn and beg[i]n to run . . . along the sidewalk." (Welch Dep. 49:9-12.)

Accordingly, although the Court cannot determine on any set of facts that Sanchez did not resist arrest, his resistance was only defensive when viewed in the light most favorable to Plaintiff. Therefore, the Court weighs this factor against Defendants' level of force.

### e.   Balancing

For the purpose of summary judgment, the Court cannot conclude that the quantum of force used by the officers was warranted as a matter of law. Although Sanchez certainly resisted the efforts to restrain him, the officers were aware that they were dealing with a man who either had been in an accident or who was emotionally disturbed; they did not suspect him of any crime. Despite Sanchez's escape from the grasp of the officers, he did not attempt to attack anyone nor did he even exhibit signs of aggression.

However, the force used by the officers was significant. King deployed his taser in dart mode, penetrating Sanchez's chest. King then continued to cycle the taser for nearly a minute while Brookins tackled Sanchez and applied two carotid holds. The remaining officers grabbed hold of Sanchez during this time and restrained his legs behind his back. That level of force undoubtedly has the potential to cause serious injury to the suspect. Accordingly, considering the *Graham* factors and the totality of the circumstances, and viewing the evidence in the light most favorable to Plaintiff, the Court cannot determine as a matter of law that the significant use of force during Phase II was reasonable.

### f.   Qualified Immunity

Because Defendants may have committed constitutional violations during Phase II of the encounter, the Court again turns to the second element of qualified immunity: whether the alleged acts violated clearly established law. Both Brookins and King argue that they are entitled to summary judgment because the law was not clearly established at the time of the incident. Indeed, Brookins argues that law was not clearly established to

"put Officer Brookins on notice that the use of his arm against Sanchez's jaw/neck to control an actively resisting, violent suspect who attempted to strike another officer, and had repeatedly fled arrest," constituted excessive force. (Brookins MSJ at 17.) Similarly, the City Defendants argue that "Ninth Circuit precedent does not clearly establish that every police officer would have known that using a Taser to restrain a suspect who just committed aggravated assault on a peace officer and aggressively and actively resisted arrest was clearly unlawful." (City Defs' MSJ at 18). Defendants' arguments, however, again misstate the factual basis on which the Court performs its inquiry at summary judgment. As the Court discussed in its earlier inquiry, a finder of fact could determine that Sanchez never attempted to strike the officers and that, while he resisted arrest, that resistance was only defensive. That factual posture forms the appropriate basis for determining whether the law was clearly established at summary judgment. *See Blankenhorn*, 485 F.3d at 477-78.

Prior to the incident, the Ninth Circuit recognized that the use of a taser may constitute an excessive use of force, particularly when multiple applications are delivered in quick succession. *Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (*en banc*). In *Mattos*, the court determined that the use of three taser cycles within a minute was excessive when the plaintiff actively resisted arrest but posed no threat to the officer or others. *Mattos*, 661 F.3d at 445-46. As the Court recognized, "three tasings in such rapid succession provide[s] no time for [a person] to recover from the extreme pain she experience, gather herself, and reconsider her refusal to comply." *Id.* at 445.

Additionally, the Court may look to a police department's "training materials" to determine "whether reasonable officers would have been on notice that the force employed was objectively unreasonable." *Drummond*, 343 F.3d at 1062. We look to the Phoenix Police Department's Operations Order 1.5, which governs the use of force by officers. That policy instructs officers to use the carotid hold on those "who are using active aggression, aggravated active aggression, or who are a threat to themselves or others." (City Defs' SSOF Ex. 6, PPD Operations Order 1.5 at 11.) Additionally, it

expressly warns officers "not [to] use the technique more than once on the same suspect because of the possibility of progressive physical injury" or to "restrain suspects who have had the carotid control technique applied with their legs behind their back." (City Defs' SSOF Ex. 6, PPD Operations Order 1.5 at 12.) Finally, the City prohibits the use of tasers and the carotid hold against persons who are restrained "unless such force is necessary to prevent imminent serious bodily injury or death." (City Defs' SSOF Ex. 6, PPD Operations Order 1.5 at 181.)

Therefore, the Court finds that a reasonable officer would have been aware on the night of the incident that it was objectively unreasonable to cycle a taser in dart mode for nearly a minute, against a suspect who was simultaneously tackled, restrained with two carotid holds and his legs behind his back, when the person defensively resisted the officers' first attempts at seizure, but who was not suspected of a crime and did not pose a serious threat to the officers or others.

This, however, does not end the inquiry, as the City Defendants assert a second basis for the defense. In their Motion, the City Defendants argue that King mistakenly believed that he was not cycling the taser the entire time thus warranting the defense based on a reasonable mistake of fact. (City Defs' MSJ at 18-19.) The Court, however, cannot determine as a matter of law that King's belief was reasonable. *See Demuth v. Cty. of Los Angeles*, 798 F.3d 837, 839 (9th Cir. 2015). As Defendants have repeatedly argued in their motion, Squier testified that he heard the sound of the taser audibly cycling. (Squier Dep. 53:22-23.) Assuming the truth of that statement, a jury could determine that it was unreasonable for King to have not heard the same sound and realize that he was cycling the taser.

Accordingly, because significant factual disputes remain to be resolved at trial, the Court denies Defendants' qualified immunity defense for the acts in Phase II at summary judgment.

### 3.    Causation and Abatement of Plaintiffs' Excessive Force Claims

In their Motion, the City Defendants make a footnote argument that "Plaintiffs do not claim, and no evidence supports, that any force used by Officers Welch or Squier proximately caused Sanchez's death. . . . Consequently, Plaintiffs' claims for Sanchez's pre-death pain and suffering based on their conduct therefore abates under Arizona law and § 1983." (City Defs' MSJ at 9 n.4.) In its Reply, the City asserts that Plaintiffs failed to respond to this argument thus conceding the argument. (City Defs' Reply at 6–7.) Despite failing to raise the argument in his own Motion, Brookins attempts to join the City by raising the issue for the first time in his Reply. (Brookins Reply at 15.) The City's initial argument, however, is undeveloped, lodged only in a footnote, and cites only non-binding precedent—which is not without criticism within this very District. *Compare Fernandez v. Virgillo*, No. 12-CV-02475-PHX-JWS, 2014 2930749, at *5 (D. Ariz. June 30, 2014), *with Erickson v. Camarillo*, No. 14-CV-01942-PHX-JAT (D. Ariz. May 30, 2017), *and Mbegbu*, 2017 WL 4679260 at *9 n.3. This much is evident by the City's attempt to fully develop this argument in its Reply[4]; however, a party may not raise an argument for the first time in a Reply brief. *See United States v. Birtle*, 792 F.2d 846, 848 (9th Cir. 1986) (quoting *Thompson v. Commissioner*, 631 F.2d 642, 649 (9th Cir. 1980)). The Court therefore will not consider the argument.

### 4.    Failure to Intervene

Just as an officer may be held liable for his own use of force, an officer may "be held liable for failing to intercede" when his fellow officer uses excessive force. *Cunningham v.* Gates, 229 F.3d 1271, 1289 (9th Cir. 2000). For the first time in their Reply, the City Defendants argue that Plaintiff's claims under a failure to intervene theory of liability fail because Plaintiff "does not identify any evidence that the officers witnessed unlawful conduct, much less that they had both the time and opportunity but

---

[4] In addition, the City's representation of its initial argument in its Reply is, at best, imprecise. In its Reply, the City argues that "Plaintiff failed to refute the medical and expert evidence that shows that the Officers' conduct did not *proximately* cause Sanchez's death." (City Reply at 6.) The City's Motion, however, raised this argument with respect to Squier and Welch only. (City Defs' MSJ at 9 n.4.)

refused to stop it." (City Defs' Reply at 13.) Given Defendants' failure to raise this argument before their Reply, the Court does not consider it for the purpose of summary judgment.

Accordingly, the Court denies the Motions for Summary Judgment on Count I of Plaintiff's Complaint. Plaintiff's excessive force claim shall proceed to trial.

### B. Count II: Denial of Medical Care

Turning to Count II of Plaintiff's Complaint, Plaintiff alleges that Defendants violated Sanchez's Fourteenth Amendment rights as a pretrial detainee by denying him medical care. Defendants move for summary judgment on this claim, arguing that the officers acted appropriately under either Fourth Amendment or Fourteenth Amendment standard. In the alternative, Defendants argue that they are entitled to qualified immunity. Plaintiff derides Defendants' arguments as "ridiculous," (Rascon Resp. at 9; Rascon Reply at 2), and moves for partial summary judgment on the same count, arguing that Defendants' failure to provide rescue breathing constitutes deliberate indifference *per se*. As Ninth Circuit has articulated, Defendants' "ridiculous" argument is, in fact, the correct argument. Accordingly, the Court will grant Defendants' Motions on this count and deny Plaintiff's Motion.

Police officers are required to provide medical care to persons who have been injured while being apprehended. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). When a plaintiff alleges deficient medical care both during and immediately following an arrest, courts in the Ninth Circuit analyze the claim under the Fourth Amendment's objective reasonableness standard. *See, e.g.*, *Tatum*, 441 F.3d at 1098–99 (analyzing officer's decision not to perform CPR under Fourth Amendment); *see also* *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1107 (N.D. Cal. 2017) ("Under the Fourth Amendment, officers must provide objectively reasonable post-arrest medical care to a detainee."); *Borges v. City of Eureka*, No. 15-cv-00846-YGR, 2017 WL 363212 (N.D. Cal. Jan. 25, 2017); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1162 (E.D. Cal. 2016); *Espinoza v. Cal. Highway Patrol*, No. 16-cv-00193-DAD-JLT, 2016 WL

4943960, at *3–4 (E.D. Cal. Sept. 16, 2016); *Bordegaray v. Cty. of Santa Barbara*, No. 14-cv-08610-CAS-JPR, 2016 WL 7223254, at *8 n.6 (C.D. Cal. Dec. 12, 2016); *Manni v. City of San Diego*, No. 11-cv-0435W (DHB), 2013 WL 6159317, at *6 (S.D. Cal. Nov. 25, 2013); *Mejia v. City of San Bernardino*, No. EDCV 11-00452 VAP, 2012 WL 1079341, at *5 n.12 (C.D. Cal. Mar. 30, 2012); *Fonseca v. City of Fresno*, No. 10-cv-00147 LJO DLB, 2012 WL 44041, at *9 (E.D. Cal. Jan. 9, 2012). Thus, the appropriate inquiry is whether an officer's conduct is "'objectively reasonable in light of the facts and circumstances confronting them' without regard for an officer's subjective intentions." *Bryan*, 630 F.3d at 832 (citing *Graham*, 490 U.S. at 397). In the Ninth Circuit, an officer acts reasonably under the Fourth Amendment when he "promptly summons the necessary medical assistance, even if the officer did not administer CPR." *Tatum*, 441 F.3d at 1099.

The parties' accounts of the events pertaining to Sanchez's medical care do not materially differ. It is undisputed[5] that (1) Squier radioed his superiors that a taser had been deployed as the other three officers secured Sanchez, (Squier Dep. 55:5-21); (2) upon realizing that Sanchez was suffering from a medical emergency, Brookins checked his pulse and released his handcuffs; (3) Brookins checked Sanchez's airway; and (4) two officers—including Brookins—delivered chest compressions in the few minutes prior to the arrival of the fire department. Plaintiff argues that "[i]t is ridiculous for the Defendants to argue that merely summoning an ambulance . . . discharges a group of four CPR trained police officers' duty to provide necessary and emergency care." (Rascon Resp. at 9.) Not only is this argument unpersuasive, but it is at odds with the law of this circuit. *See Tatum*, 441 F.3d at 1099. Thus, because the officers not only promptly summoned assistance, but also administered chest compressions to Sanchez, Defendants acted reasonably under the Fourth Amendment. Even assuming that Defendants' conduct was objectively unreasonable under the Fourth Amendment, Defendants are entitled to

---

[5] Again, to the extent the Plaintiff "disputes" any fact, he fails to do so by citing to facts in the record, instead arguing that a jury must determine "the truthfulness of [Defendants'] testimony." (*See, e.g.*, Doc. 205, Rascon SSOCF SOF ¶¶ 84-90.) This response is insufficient to raise a dispute of material fact. *See* LRCiv 56.1(b).

qualified immunity as Plaintiff can point to no case establishing that failing to administer rescue breathing violates an individual's Fourth Amendment rights.[6] Accordingly, the Court denies Plaintiff's Motion for Partial Summary Judgment on Count II of the Amended Complaint, and the Court grants the Individual Defendants' Motions for Summary Judgment on the identical Count.

### C.    Count III: Municipal Liability

The City of Phoenix next moves for summary judgment on Plaintiff's *Monell* claims. (City Defs' MSJ at 20-26.) The City argues that insufficient evidence exists to show that the City was deliberately indifferent for failing to either (1) "train or supervise *these* Officers in its use of force policies and CPR; (2) discipline them for this incident; (3) discipline Officer Brookins for dissimilar and unrelated incidents that occurred *after* this incident; [or] (4) screen Officer Brookins before hiring him." (City Defs' MSJ at 20.) In addition, Plaintiff moves for partial summary judgment on the same count; however, Plaintiff's motion merely seeks to establish that certain "facts" are not in dispute.[7]

---

[6] Although Plaintiff points to Fourteenth and Eighth Amendment case law to support his argument, this argument is premised on the mistaken assumption that Sanchez was a pretrial detainee; however, even if arising under the Fourteenth or Eighth Amendment, Plaintiff's claim still fails. For a pretrial detainee to state a claim for denial of medical care under § 1983, the plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F. 3d 1091, 1096 (9th Cir. 2006) (internal citation omitted). A plaintiff must show that the defendant engaged in a "purposeful act or failure to respond to the plaintiff's pain or possible medical need." *Id.* In this context, courts in the Ninth Circuit have found that "officers trained to administer CPR who nonetheless did not do so" may be liable for deliberate indifference. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013). The *Lemire* Court, however, noted the difference between officers that do nothing and officers that are actively engaged. *See id.* ("[Defendants] did not fail to provide CPR because they were busy with other tasks. Instead, they allegedly took no life saving action while waiting . . . ."); *see also Cartwright v. City of Concord*, 856 F.2d 1437, 1438 (9th Cir. 1988) (finding that failure to administer CPR was not deliberate indifference when defendants cut down victim, checked vital signs, and administered aid). The facts of this case do not portray officers that "took no life saving action while waiting." *See Lemire*, 726 F.3d at 1083. It is undisputed in this case that the officers did more than just stand around and were actively involved in an attempt to save Sanchez's life. Accordingly, it cannot be said that the officers acted with deliberate indifference.

[7] Plaintiff's Motion as to Count III is largely nonsensical and represents a fundamental misunderstanding of the basis for municipal liability under *Monell*. Of the 16 "policies" submitted by Plaintiff for summary judgment, 11 relate to statements by a single officer about his own training. (*See, e.g.*, Rascon MSJ at 12–13.)

Just as an individual, a municipality may be liable under 42 U.S.C. § 1983 when the municipality "itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Government entities, however, "are not vicariously liable under § 1983 for their employees acts," but rather are responsible "only for their *own* illegal acts." *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, *Monell* liability may attach if the Plaintiff can establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty v. Brown,* 520 U.S. 397, 404 (1997). However, "liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### 1.    Adequacy of Plaintiff's Response

At the outset, the Court notes that, in response to six pages of argument by the City in its Motion for Summary Judgment on Plaintiff's *Monell* claims (*see* City Defs' MSJ at 20-26), Plaintiff responds with five conclusory sentences broadly citing to 61 separate, controverting statements of fact without any legal argument for the Court to consider.[8] Plaintiff's own Motion for Summary Judgment (Doc. 175) is similarly devoid

---

[8] Plaintiff's response to the City summary judgment motion on Plaintiff's *Monell* claims reads, in its *entirety*, as follows:

> There is an overwhelming amount of evidence of record to support the existence of *Monell* liability in this case. The Defendants blatantly violated Operations Order 1.5—the City's claimed use of force policy. (SOF 326–349). The Defendant City's training program failed to effectively and/or properly train the Defendants regarding Operations Order 1.5, use of force, knee strikes, TASERs, neck holds, and CPR. (SOF 350–

- 31 -

of any argument premised in the law that would serve to contradict the arguments made by the City. In that Motion, Plaintiff seeks to establish the veracity of particular city policies and training methods, but neither argues nor demonstrates that these policies constitute deliberate indifference nor that they caused Sanchez's injuries. Such a response is utterly deficient at summary judgment and is a dereliction of Plaintiff's responsibility in opposing the motion. The Court is not required to "manufacture arguments" for a party. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Therefore, the Court would be within its discretion to grant summary judgment to the City on Plaintiff's *Monell* claims for this failure alone, *and would so do*; however, because the claims are ultimately resolved in the City's favor, the Court addresses each in turn in an effort to resolve all claims on the merits.

### 2. Failure to Train

The City first moves for summary judgment on the Plaintiff's allegation that it failed to train its officers such that the failure was the moving force in causing Sanchez's injuries. (City Defs' MSJ at 20–23.) Municipal liability "is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). A plaintiff alleging liability on the basis of a municipality's failure to train must identify the deficiency in the municipality's training program which amounts to deliberate indifference and must establish that it directly caused the constitutional violation. .*See Blankenhorn*, 485 F.3d at 484. Merely demonstrating that a *particular* officer may have been unsatisfactorily trained is not sufficient "to fasten liability on the city." *City of Canton*, 489 U.S. at 388. Instead, a plaintiff alleging a city's failure to train must provide evidence demonstrating a "program-wide inadequacy in training." *Blankenhorn*, 485 F.3d at 484–85. Otherwise, "any shortfall in a single officer's training 'can only be classified

---

365; 376–398). The Defendant City's investigation failed to note the numerous policy violations and training deficiencies. (SOF 366–398). Finally, there is overwhelming evidence of record to support a *Monell* claim based upon constitutionally deficient hiring and supervision. (SOF 389–398).

(Rascon Resp. at 15.)

as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference.'" *Id.* (quoting *Alexander v. City & Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)). Accordingly, "[a] 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.'" *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (quoting *Connick*, 563 U.S. at 62).

Plaintiff's failure to train claim is premised on the City's alleged deficiencies in training its officers on use of force standards and the use of a taser.[9] The City, however, argues that these claims fail because the undisputed facts show (1) that the individual officers received adequate training, (2) that the City's use of force and training policies are constitutional, and (3) that no facts establish a widespread problem sufficient to fasten *Monell* liability. (City Defs' MSJ at 22–23.) In support of its argument, the City first presents evidence that new officers are required to attend 585 hours of basic training and to pass a battery of physical and written tests before entering the field. (Doc. 187, City SSOF ¶ 94.) All four officers involved in the incident completed that training and passed the requisite tests. (City Defs' SSOF Ex. 14.) As Arizona Police Officer Standards and Training ("AZ POST") regulations mandate, each officer completed in-service proficiency training in the two years preceding the Sanchez encounter. (City Defs' SSOF Ex. 14.) The officers both reviewed the City's use of force policies and received recertification on the use of the TASER X-26 during these sessions. (City Defs' SSOF Ex. 14.) The City further points to the report of its police procedures expert, Greg Meyers, who opined that both Operations Order 1.5—which governs the use of force by PPD officers—and the City's training regimen, meets or exceeds national standards and practice. (Doc. 193-4, Brookins SSOF Ex. 14, Greg Meyer Report ("Meyer Report") at 17.) Accordingly, the City has met its burden for the purpose of summary judgment.

---

[9] To the extent Plaintiff's failure to train claim was premised on an allegation regarding the City's CPR policies and training, the Court grants summary judgment to the City. Because Plaintiff fails to establish an underlying constitutional violation, her *Monell* claim also fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Plaintiff's principal argument in opposition to the City's motion demonstrates a fundamental misunderstanding of the basis for failure to train liability. Plaintiff argues that the City's "training program failed to effectively and/or properly train the Defendants regarding Operations Order 1.5, use of force, knee strikes, TASERs, neck holds, and CPR." (Rascon Resp. at 15.) Even assuming the City failed to train these particular Defendants, the Plaintiff must establish a "program-wide inadequacy in training." *See Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (quoting *Alexander*, 29 F.3d at 1367). Evidence of a City's failure to train a few individual officers does not rise to the level of "deliberate indifference" required to establish municipal liability. *See id.*

Plaintiff's evidence in support of this argument proves no more helpful in light of her complete lack of argument. The bulk of Plaintiff's controverting statements of fact, and the evidence submitted in support of those facts, merely cite to excerpts from each of Defendants' depositions about the extent to which one or two of the Defendants—in particular King and Welch—recall their own training. (*See, e.g.*, Doc. 205, Rascon SSOCF ¶¶ 350–365.) Such evidence is insufficient to controvert the robust evidence presented by the City as to its policies and practices because it does not speak to a citywide deficiency. *See Blankenhorn*, 485 F.3d at 484–85 ("[A]bsent evidence of a program wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant." (internal citations omitted)); *see also Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1016 (D. Ariz. 2012) (finding that individual officers' unfamiliarity with material used to train them "does not give rise to municipal liability on a failure-to-train theory"). Further, these statements neither establish the unconstitutionality of the City's policies or training nor do they show those policies were the moving force in causing Sanchez's injury.

Plaintiff further attempts to controvert the City's facts by broadly citing to the entirety of the report by her police procedures expert, Roger Clark. (*See* Doc 205, Rascon SSOCF ¶ 149; Doc. 206-12, Rascon SSOCF Ex. 12, Clark Report). Clark's Report, however, does not note any failure by the City either in formulating its policies or in

training its officers. In fact, Clark's Report *supports* the City's argument. Clark attests both that the officers' use of force was "in violation of training, policy, and law (as taught by AZ POST)," and that "[t]he Phoenix Police Department has a codified and robust set of 'Operations Order[s]' that steer, dictate, and mandate how, when, where, and what level of forces Officers can use." (Clark Report at 11.) Clark further states that "the use of a taser in this instance grossly deviated from the AZ POST training." (Clark Report at 21.) Even assuming that Plaintiff actually intended to cite to Clark's Supplemental Report, that report is similarly unavailing because Clark relies solely on testimony from the individual officers regarding the extent to which they recall their own training. (Doc. 206-13, Rascon SSOCF Ex. 13, Roger Clark Supplemental Report ("Clark Supp. Report") at 2–36.) As stated earlier, the extent to which *these* officers were trained or they recall their training is insufficient to establish deliberate indifference by the City to any deficiency in its training policies. Accordingly, despite Plaintiff's contention that record contains "an overwhelming amount of evidence" to support such a claim, the record is devoid of evidence sufficient to prove Plaintiff's claim.

Finally, Plaintiff fails to present any evidence that would tend to show that the City "was faced with a pattern of similar constitutional violations by untrained employees" that would put the City "on 'notice that a course of training was deficient in a particular respect.'" *Flores*, 758 F.3d at 1159 (citing *Connick*, 563 U.S. at 62). Indeed, the Court does not find any evidence in the summary judgment record to support a finding that the City was or should have been aware of similar violations by its officers involving the uses of force alleged by the Plaintiff—namely, the use of knee strikes, multiple uses of a carotid hold, and repeated, lengthy applications of a taser. Although Clark's Supplemental Report points to the City's review of officer shootings between 2009 and 2014 (*see* Clark Supp. Report at 36–39) to support a finding that the City was on notice as to particular deficiencies with its policies and training practices,[10] it does not

---

[10] Although referenced in Clark's Supplemental Report, Plaintiff has not submitted evidence of such a review elsewhere in the record at summary judgment, either by submission or reference to another portion of the record. Because Clark's assertions are

follow that a deficiency in the City's training on the use of handguns indicates that the City's training was deficient with respect to hand-to-hand force or the use of tasers. Moreover, to the extent that Plaintiff offers the fact of the report to prove the City was on notice of any violation, it does not appear that the findings of the report were complete prior to the incident, as the report purports to cover officer involved shootings through 2014. Thus, because the report was not in existence at the time of Sanchez's injury, it cannot be said that the City was on notice of its findings at the time of the incident in this case.

In sum, Plaintiff has not provided facts sufficient to show that 1) the City of Phoenix was on notice of a deficiency in its officer training program or 2) the City's training program and policies were in fact deficient. Accordingly, Plaintiff fails to create a genuine dispute on the City's liability under a failure to train theory. The Court grants the City summary judgment as to Plaintiff's failure to train claim.

### 3. Ratification

Plaintiff's *Monell* theory of liability also purports to rely on the City's ratification of Defendants' conduct through the City's failure to adequately investigate and discipline the officers for their actions. (*See* Am. Compl. ¶¶ 177–79.) The City moves for summary judgment as to this theory. (City Defs' MSJ at 23–24.)

A ratification theory of liability requires that a plaintiff "prove that the 'authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "Ratification, however, generally requires more than acquiescence." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 1765 (2015); *see also Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) (finding a plaintiff must "present 'something more' than a failure to discipline" to survive summary judgment). Thus, when a plaintiff shows only that a municipality "fail[ed] to discipline" a subordinate, a ratification theory of *Monell* liability fails. *Id.*; *see also, e.g., Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir.

insufficient to survive summary judgment, the Court need not determine whether it may properly consider the evidence presented by Clark.

1989) ("[W]e cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*."); *Garcia v. City of Imperial*, No. 08-cv-2357 BTM(PCL), 2010 WL 3911457, at *1-2 (S.D. Cal. Oct. 4, 2010) (finding that plaintiff must show more than "the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures"). Instead, a plaintiff must show that the municipality made "a 'conscious, affirmative choice' to ratify the conduct in question." *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992)), *overruled on other grounds*, *Brousseau v. Haugen*, 543 U.S. 194 (2004).

In support of this aspect of the motion, the City argues that its policy requires concurrent investigations by "the PSB, the officer's supervisor, the Violent Crimes Bureau/Homicide Unit, and the Incident Review Unit." (City Defs' MSJ at 24 (citing City Defs' SSOF ¶ 111).) Further, the City presents evidence both that a thorough investigation took place by the PSB, and that the Maricopa County Attorney's Office independently investigated, finding no misconduct. (City Defs' SSOF ¶¶ 90-92.) Yet again, Plaintiff fails to offer any responsive argument to the City's Motion, stating only that "[the] City's investigation failed to note the numerous policy violations and training deficiencies." (Rascon Resp. at 15.) Plaintiff broadly cites to thirty alleged controverting statements of fact in support of this contention. Given this failure, the Court again looks to Clark's Supplemental Report (Doc. 206-13), which contains the subsection titled "The City of Phoenix's Unconstitutionally Deficient Investigations into the Conduct of Its Officers." Within that section of the report, Plaintiff's expert, Roger Clark, discusses the City's investigation into the Sanchez incident, as well as the City's investigations into two later use-of-force incidents involving Brookins. (Clark Supp. Report at 45-57.) To the extent that Plaintiff's ratification claim relies on the September 23, 2012 incident or the April 20, 2013 incident[11] (*see* Doc. 206-13, Clark Supp. Rep. at 50-57), those claims

---

[11] Again, Plaintiff has not submitted evidence of these events into the summary judgment record other than through her expert's assertion of the facts. The Court, therefore, has reservations about the propriety of considering such evidence on summary

fail as a matter of law. *Monell* requires "a direct causal link" between the municipality's action and "the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. It is entirely unclear to this Court how the City's alleged failure to investigate Brookins' conduct in *subsequent* encounters with the public can be said to have ratified the alleged deprivations that occurred in *this* encounter, particularly given the factual differences in the alleged events.

Therefore, the City's investigation and discipline of the officers following the events of April 12, 2012, remain the only factual basis for Plaintiff's ratification claim that the Court can discern. In his supplemental report, Clark opines that "[t]he City's deliberate indifference was manifested in its investigations into the use of excessive force by its officers." (Clark Supp. Report at 45.)[12] Clark's conclusion stems from the City of Phoenix finding that the officers' use of force against Sanchez complied with the City's policy. (Clark Supp. Report at 50.) In particular, Clark accuses the City of "failing to reference the obvious inconsistencies as to the type of chokehold" and of "attempt[ing] to cover up the use of the carotid chokehold twice." (Clark Supp. Report at 49.) Although a ratification theory of liability may lie when the police conduct "an obviously flawed investigation of [a] plaintiff's excessive force claim," *Garcia*, 2010 WL 3911457 at *2 (citing *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)), the facts in this case do not support such a finding, nor does any evidence in the record support Clark's conclusions. In particular, Clark's supplemental report mischaracterizes the content of the PSB Report, which openly acknowledges that witnesses, including Brookins, described Brookins' hold as a "carotid" at certain point. (*See* Doc. 187-2 at 52, City SSOF Ex. 1, PSB Report.)

---

judgment. The Court, however, need not reach that question because it ultimately rules in Defendants' favor.

[12] To the extent that Clark offers the opinion that the City's investigation constituted deliberate indifference, the Court disregards that opinion as it purports to offer a legal conclusion. *See United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999).

Plaintiff's evidence does not rise to a level that would tend to show that the City's investigation was obviously flawed. Rather, the PSB report reflects that the investigators weighed the evidence available before concluding that Brookins did not use a carotid hold, or any hold that violated such policy. Accordingly, Plaintiff fails to present evidence sufficient to survive summary judgment as to a ratification theory of liability. The Court will grant the City's Motion as this to theory of *Monell* liability.

### 4. Failure to Screen

Lastly, Plaintiff brings a claim under *Monell* against the City of Phoenix for the City's alleged failure to screen Brookins prior to the City hiring him as an officer.[13] (Am. Compl. ¶¶ 165–66.) The City again moves for summary judgment on this aspect of Plaintiff's claim.

As with failure to train theory, when a plaintiff premises a § 1983 claim "upon the inadequacy of an official's review of a prospective applicant's record . . . there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." *Brown*, 520 U.S. at 410. Therefore "[a] court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* A municipality's hiring decision will be deemed to constitute "deliberate indifference" only if a review of the employee's background would have led the municipality "to conclude that the *plainly obvious* consequence of the decision to hire the applicant" would be the deprivation of a citizen's specific federally protected right. *Id.* at 411. Thus, the facts must support "a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff." *Id* at 412; *see also Estate of Alvarado v. Shavatt*, 673 F. App'x 777, 778 (9th Cir. 2017) (finding officer's record of prior unlawful searches and seizures insufficient to establish that the plainly obvious consequence of hiring was the victim's "seizure accomplished through firing a gun").

---

[13] Plaintiffs' First Amended Complaint does not allege this same theory of liability as to King, Squier, or Welch. Therefore, the analysis under this theory of liability focuses only the City's hiring of Officer Brookins and his alleged acts on the night in question.

The bar is high for demonstrating that an officer's conduct was the "plainly obvious" consequence of a municipality's hiring decision. For example, the Supreme Court in *Brown* determined that a department's hiring of an officer with prior criminal charges for assault and battery, resisting arrest, and public drunkenness, in addition to numerous traffic violations, did not carry the "plainly obvious" consequence that the officer would use excessive force. *Brown*, 520 U.S. 397 at 414. As the Court noted, the applicant's record "may well have made him an extremely poor candidate"; however the hiring decision could not be said to "constitute 'deliberate indifference' to [the plaintiff's] federally protected right to be free from a use of excessive force." *Id.* at 414-15. Similarly, an applicant's record "of prior misconduct in past jobs"—including the use of force in a position as a security guard—has proven insufficient to avoid summary judgment on a failure to screen claim. *See, e.g., Gonzalez v. Alva*, No. 11-CV-2846 W(WVG), 2013 WL 3795691, at *3 (S.D. Cal. July 19, 2013).

In opposition to the City Defendants' Motion, Plaintiff merely argues that there is "overwhelming evidence" in the "record to support a *Monell* claim based upon constitutionally deficient hiring." (Rascon Resp. at 15.) Plaintiff's argument, however, rests upon the conclusory statement by Plaintiff's expert that "[t]he City could reasonably anticipate that the issues present in the hiring process would lead to the excessive and unconstitutional use of force against citizens." (Rascon SSOCF Ex. 13, Clark Supp. Report at 58-61.) This conclusion is unsupported by the record as a matter of law.

To prove his point, Clark's Supplement Report cites to the following facts[14]: (1) that Brookins served as an Army Sniper and received a discharge from that position indicating "unsatisfactory performance"; (2) that Brookins worked as an armed security guard and was not eligible for rehire; (3) that Brookins failed a psychological exam for the City of Glendale police department; and (4) that Brookins maintained an email

---

[14] Once more, Plaintiff fails to submit evidence of these facts other than through the assertion of an expert as to their veracity.

address consisting partially of the term "whiteboy" at the time he was hired. (Clark Supp. Report at 58-61.)

Even assuming the truth of these facts and viewing them in the light most favorable to Plaintiff, she fails to raise a triable issue. Turning first to Brookins' military discharge, Clark indicates that a soldier may receive an "unsatisfactory performance" discharge when his "performance to date has been satisfactory" and his "retention would have an adverse impact on good order and morale." (Clark Supp. Report at 59.) Further, such a discharge requires a finding that the soldier "will be a disruptive influence," that "the circumstances are likely to recur," and that the soldier is unable "to perform effectively in the future." (Clark Supp. Report at 59.) Even if the City had been aware of these facts, the Court does not agree that it would have been "plainly obvious" to the City that Brookins was "highly likely" use unconstitutional force in the manner Plaintiff alleges. *See Brown*, 520 U.S. at 414.

The circumstances surrounding Brookins' background as a security guard fare no better in proving this point. Plaintiff's evidence shows that Brookins' supervisor indicated that Brookins "lied" and "was not eligible for rehire." (Clark Supp. Report at 60.) It requires a leap in logic for one to conclude from this fact that it would have been "plainly obvious" that Brookins would act in the specific manner alleged by Plaintiff. Next, although Plaintiff introduces facts showing that the City of Glendale rejected Brookins for negative testing on a psychological screening test, Plaintiff introduces no facts to show that Brookins' failure related to aspects of the test that made it "plainly obvious" that Brookins was nearly certain to use excessive force on the job in the particular manner that Plaintiff alleges. Finally, Brookins use of an online pseudonym containing the phrase "whiteboy" reveals nothing about a predisposition or likelihood to act in the manner alleged.

Even in the light most favorable to Plaintiff, these facts are insufficient to support a finding that the City of Phoenix acted with deliberate indifference by failing to adequately screen Brookins prior to his hiring. Plaintiff's attempt to present said facts

under the guise of an expert's opinion does not create a triable issue. Although a rational finder of fact could certainly conclude that the City's decision was misguided, that is not the test. *See Brown*, 520 U.S. 397 at 414. Plaintiff is at best seeking to impose *respondeat superior* liability on the City for hiring Brookins; however, *Monell* and *Brown* expressly forbid municipal liability on this basis. Thus, the Court cannot say that the City, if fully aware of these facts about Brookins' background, would conclude that it was "plainly obvious" that Brookins was "highly likely" to violate an individual's right to be free from the use of excessive force. Therefore, Plaintiff's failure to screen claim fails and the Court grants summary judgment to the City on that aspect of Plaintiff's *Monell* claim.

### D. Punitive Damages

Finally, both Brookins and the City Defendants move for summary judgment as to Plaintiff's claim for punitive damages. (Brookins MSJ at 25; City Defs' MSJ at 19-20.) "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As discussed above, the Court grants summary judgment on Plaintiff's claims for denial of medical care and thus Plaintiff cannot recover punitive damages stemming from that claim. However, the Court finds that the evidence is sufficient that a jury might find Defendants' use of force involved a "reckless or callous indifference" to Sanchez's rights. Accordingly, the Court denies Defendants' motion as it pertains to punitive damages on Plaintiff's remaining claim.

### IV. CONCLUSION

In short, the only claim remaining for trial is Plaintiff's § 1983 claim against Brookins, King, Welch, and Squier for the use of excessive force. No claim remains against the City of Phoenix. The Court will set a hearing to discuss a trial date with the parties by separate Order.

**IT IS THEREFORE ORDERED** denying Plaintiff's Motion for Partial Summary Judgment (Doc. 175).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendant Clinton Brookins' Motion for Summary Judgment (Doc. 192). Defendant Brookins is entitled to summary judgment on Plaintiff's denial of medical care claim (Count II). The balance of Brookins' Motion is denied, and Plaintiff's excessive force claim (Count I) will proceed to trial.

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants Jeremy King, Nicholas Welch, Steven Squier, and the City of Phoenix's Motion for Summary Judgment (Doc. 186). Defendants Squier, Welch, and King are entitled to summary judgment on Plaintiff's denial of medical care claim (Count II). Defendant the City of Phoenix is entitled to summary judgment on Plaintiff's municipal liability claim (Count III). The balance of Defendants' Motion is denied, and Plaintiff's excessive force claim (Count I) against King, Squier, and Welch will proceed to trial.

Dated this 8th day of February, 2018.

Honorable John J. Tuchi
United States District Judge